WALLING, Adm'r of Wage and Hour Division, U. S. Dept. of Labor, v. NEWMAN et al.

SAME v. GEHAN et al.

Civil Actions Nos. 222, 224.

District Court, N. D. Iowa, W. D.

June 26, 1945.

Douglas B. Maggs, Sol., and Archibald Cox, Associate Sol., both of Washington, D. C., Reid Williams, Regional Atty., and Henry J. Smith, Associate Atty., both of Kansas City, Kan., and Joseph I. Nachman, Associate Atty., of Washington, D. C., all of United States Department of Labor, for plaintiff in both cases.

Louis S. Goldberg, of Sioux City, Iowa, for all defendants in both cases.

GRAVEN, District Judge.

Two actions consolidated for purposes of trial in which injunctions are sought to enjoin alleged continuing violation of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., hereinafter referred to as the Act. There is involved in each case the question of "administrative" exemption under the Act. There is only one employee whose status is invoked in each case. In the first case it is the status of one A. M. Johnsen which is involved, while in the second case it is the status of one Arthur Anderson, each of whom have the title of office manager and bookkeeper. The defendants admit that they are engaged in interstate commerce; that the regulation promulgated by the Administrator of the Wage and Hour Division of the United States Department of Labor as to "administrative" exemption is a proper exercise of his power

under the Act; and that the burden is upon them to establish the exemption.

Congress in Section 13(a)(1) of the Act, 29 U.S.C.A. § 213(a)(1), provided for exemption from the minimum wage and overtime provisions of the Act "any employee employed in a bona fide * * * administrative * * * capacity * * * (as such terms are defined and delimited by * * * the Administrator)." The Administrator did not at first give a separate definition and delimitation to the term "administrative," but on October 12th, 1940, he did so by Section 541.2 of Title 29, Chapter V. of the Code of Federal Regulations. That Regulation provides as follows:

"Section 541.2. Administrative.

"The term 'employee employed in a bona fide * * * administrative * * * capacity' in Section 13(a)(1) of the act shall mean any employee—

"(A) Who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities), and

"(B) (1) Who regularly and directly assists an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), where such assistance is nonmanual in nature and requires the exercise of discretion and independent judgment; or

"(2) Who performs under only general supervision, responsible nonmanual office or field work, directly related to management policies or general business operations, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment; or

"(3) Whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations involving the exercise of discretion and independent judgment."

 Sub-paragraphs (1) to (3) of Paragraph B of the above regulation being in the disjunctive, it is only necessary for an employee to meet the conditions of any one of those sub-paragraphs, plus the salary requirement of Paragraph A. George Lawley & Son Corporation v. South, 1 Cir., 1944, 140 F.2d 439, 151 A.L.R. 1081. The defendants in the instant cases claim the employees in question are exempt under sub-paragraph (2) of Paragraph B. It is authoritatively stated that while interpretative statements of the Administrator are not issued as regulations under statutory authority, yet they carry persuasiveness. Overnight Motor Co. v. Missel, 1942, 316 U.S. 572 (note 17), 62 S.Ct. 1216, 86 L.Ed. 1682. It is also clear that well paid employees are not to be denied the benefits of the Act. Jewell Ridge Corporation v. Local No. 6167, 1945, 65 S.Ct. 1063, 89 L.Ed. 1011. See also, George Lawley & Son Corporation v. South, supra. It is well settled that exemptions from the Fair Labor Standards Act are to be strictly construed and claimed exemptions therefrom must be established by a clear preponderance of the testimony. Smith v. Porter, 8 Cir., 1944, 143 F.2d 292. Accord, Fleming v. Hawkeye Pearl Button Co., 8 Cir., 1940, 113 F.2d 52, 56.

 It seems clear that the Administrator promulgating regulations within the limits of the power given him by Congress is his own lexicographer, so far as assigning therein particular meanings to particular words and terms. Such assigning may be either done specifically or by context. When, however, the Administrator has not assigned a definite meaning to particular words and terms, a court must assume that such particular words or terms are to be given their generally and ordinarily understood meaning. For a court not to do so would make a regulation a judicial snare and trap for the well-intentioned and the law abiding.

In the instant cases, the controversy between the parties centers around (1) the meaning to be given the word or term "nonmanual", and (2) whether the particular employees in question were in the performance of their duties "exercising discretion and independent judgment." The first point of controversy would seem to have to do with a general rule, while the second point of controversy would seem to have to do with the particular fact situation as to each of the two particular employees in question. In effect, it is the position of the defendants in the instant cases that their claims for exemption are fully sustained by the interpretations of the Administrator, and that the inspection department or division of the Regional Office for the Wage and Hour Division is misinterpreting the Administrator's interpretations.

The defendants in each case are copartners engaged in the live stock commission business at the Sioux City Stockyards at Sioux City, Iowa. In each case

the partnership consists of two partners all of whom are active partners. The different live stock commission firms at the Sioux City Stockyards' have their offices in what is known as the Exchange Building, which is apparently a building of considerable size. The Sioux City Livestock Exchange is an organization which constitutes the governing agency for the marketing agencies operating at the yards. That organization has its office with a secretary and staff in the Exchange Building. The Sioux City Stockyards is subject to the provisions of the Packers and Stockyards Act, 7 U.S.C.A. § 181 et seq., and there is a government Market Supervisor stationed at the Exchange. The different livestock commission firms must furnish reports of their activities under that Act, and such firms keep closely in touch with the Market Supervisor. It appears that the Exchange Building constitutes what might be called the "control" center, or "nerve" center, or "focal" center for the livestock commission business at the Sioux City Stockyards. The livestock pens where livestock are bought and sold, are a distance from the Exchange Building. The livestock commission business as typified by the firms in the instant cases is rather unique in that the owner-executives spend most of their time away from the office out in the yards, where assisted by salesmen and yardmen they sell livestock on commission.

The greater portion of the livestock brought to the yards arrives by truck, consigned to a particular commission firm. While generally the entire truck load is consigned to a particular firm, yet in certain cases, a truck load contains livestock consigned to more than one firm. Upon or shortly after arrival ownership tickets for the livestock are delivered to the particular firm to which it is consigned. After the livestock is sold out in the yards, sales tickets come back to the office with the weights and sale prices on them. In a great many cases the shipper either comes along with the shipment or follows it in. The great majority of the patrons call at the offices during the year in regard to current shipments or for information and advice as to matters connected with the livestock industry and prospective operations and shipments. It appears that the usual first place of stopping for current and prospective shippers is at the office of the particular firm of which the shipper is a patron or a prospective patron. Frequently shippers

wish a substantial advance on their livestock after it has been consigned but before it is sold. Shippers also call at the office to have adjusted complaints in regard to sales or service. Shippers also call at the office to get the information as to probable market trends as to feed and feed trends, price ceilings and other governmental regulations, and such other information as would be of assistance to them in regard to the carrying on of their livestock operations and marketing their livestock. Shippers who come along with their shipments or follow them in, generally and usually call at the office after the livestock has been sold and receive settlement. It appears that as to the business of a particular livestock commission firm that the office of the firm is what might be termed the "control" center, the "nerve" center, or "focal" center.

Mr. A. M. Johnsen, the employee whose status is in question in the first case, is 41 years of age. He has had a high school education followed by a course in accounting. He has been employed by the defendant, Sioux City Livestock Commission Company, since 1936. He was a deputy county clerk in Nebraska for ten years and with the Firestone Tire & Rubber Company for one year before entering upon his present employment. He is individually a member of the Sioux City Livestock Exchange. He started at $100 a month, which continued for three months or until August 1st 1936. On August 1, 1936, his salary was raised to $125 a month, and continued at that rate until April 1, 1938, when it was raised to $150 a month. On March 1, 1939, it was raised to $175 a month. On January 1st 1941, it was raised to $200 a month. On January 1, 1942, it was raised to $210 a month, and on July 1, 1943, it was raised to $235 a month. Since January 1, 1945, he has had an agreement that in addition to his salary of $235 a month, he is to receive ten per cent of the net profits of the firm. At the current rate of profits this will amount to $70 a month additional. Mr. Johnsen's title is that of office manager and bookkeeper. He is the only full time office employee. After the firm's employees in the yards have completed their work there they come in and assist in the office, and he directs their work. During the course of a year around seventy-five per cent of the firm's customers come to the office. In addition to handling the matter of a particular sale for such shippers, he goes over with them the present and future market condi-

tions, the feeding of livestock and the feed situation. He keeps in touch with the changing governmental rules and regulations relating to the livestock business, for the benefit of his firm and its customers, and is consulted by the firm's customers in regard to them. He makes out the reports required under the Packers and Stockyards Act and confers with the Market Supervisor. The firm's sales are cleared through the office of the Secretary of the Exchange, and Mr. Johnsen attends at the office of the Secretary daily in connection therewith, and also confers with the Secretary as to matters having to do with the livestock commission business. He buys the greater part of the advertising for the firm, and prepares advertising for the firm. He submits the advertising so prepared to the members of the firm for approval. He writes checks on the firm's bank account without countersignature. Mr. Johnsen makes settlement with the customers for the livestock sold by the firm. He directs the work of the employees in the yards when the owners are away and sometimes when they are not away. He purchases the supplies for the firm and most of the office equipment. His suggestions as to re-arrangement of the office and the installation of a new system of accounting were followed. He irons out and adjusts complaints of shippers as to sales or service. Mr. Wilson, one of the members of the firm, spends around two hours a day in the office, while Mr. Newman, the other member of the firm, is very seldom in the office. Mr. Johnsen regularly and constantly makes recommendations to the members of the firm as to the conduct of the business, and participates in management conferences with them. They rely upon Mr. Johnsen's discretion and judgment in handling and dealing with customers and as to general business operations and he has the authority to make and does make on the spot decisions relating thereto. Mr. Johnsen decides whether a shipper or his shipment is such that an advance can be made against the shipment and the amount of the advance. The firm makes livestock loans. Mr. Johnsen prepares financial statements and the loan papers and makes recommendations to the members of the firm as to the safety of the loan. The volume of livestock commission business is variable. It appears that the heaviest livestock runs are on Mondays, which necessitates long hours of service on that day. It appears that the runs slacken off until there is a very small run on Friday and none on Saturday. Apparently Mr. Johnsen is putting in from 48 to 50 hours a week, with much of the so-called overtime occasioned by the long hours on Mondays. It appears that Mr. Johnsen averages from 20 to 25 hours a week doing bookkeeping work, and the balance of his time is taken up with the other duties referred to.

Arthur Anderson· the other employee whose status is in question is 40 years of age. He had a high school education, followed by two years of business college training, and has completed two home study courses in accounting. He has been employed by the defendant, Gehan Livestock Commission Firm since July 1st 1940. Prior to that he had been employed for nine years by a produce company. Apparently his duties with that employer were in the office. He had also worked in various departments of the Cudahy Packing Company for about a year. He started on July 1, 1940, with a salary of $125 a month plus overtime. From July 1, 1942, to August 1, 1942, he was paid $135 a month plus overtime. From August 1, 1942, to August 2, 1943, he was paid $150 a month plus overtime. From August 2, 1943, to October 1, 1943, he was paid $155 a month plus overtime. From July 1, 1944, he has been paid at the rate of $200 a month and no overtime. There is a woman in the office with Mr Anderson who does stenographic work. There are some variations in the situation as between the two employees. For instance, Mr. Anderson's firm does not engage in the livestock loan business. Mr. Anderson puts in some time stimulating business for his employers in the vicinity of his former home in Minnesota. However, the parties in the instant cases regard the status of the two employees as substantially similar, and witness so testified. However, it should be noted that Mr. Johnsen has been with his firm around nine years and Mr. Anderson has been with his firm around four years; and that while Mr. Johnsen's salary is considerably larger than Mr. Anderson's, that Mr. Anderson's salary has been increasing at about the same rate as Mr. Johnsen's. It is believed also that because of his longer period of service and longer experience that Mr. Johnsen has been entrusted with somewhat more responsibility and authority than has Mr. Anderson. It is also believed that there is not sufficient difference in their situations as to necessitate a distinction between them as to their status under the Act. Both of the livestock commission firms in-

volved in these cases are old and long established firms.

It appears that in the case of livestock commission offices that the transition from a routine bookkeeper to an office manager exercising independent judgment and discretion in the management of the firm's business is one that may not take place or that may take place gradually. It is believed that it is a fair inference that employees who did not evidence capabilities for such growth and change are apt to be replaced by those that do, for the work of conducting the livestock commission business is such that something other than a mere routine bookkeeper is needed at the office. When such an employee starts his status is doubtless that of a routine bookkeeper, who as to decisions relating to the general business operations has to have such decisions made by the members of the firm during the brief periods when they are in the office, or with some difficulty and delay relay the information out to the members of the firm out in the yards and get the decision back. If such an employee begins to show that he has the judgment and ability to deal and handle situations, more and more on the spot decisions are left to him. If he shows a good and growing grasp of business and business policies, the firm gradually begins to value his views and opinions as to such matters and accept his recommendations, until the time finally comes when he plays an important and responsible part in guiding and managing the business. It would seem to be a question of fact in each particular case whether a particular employee has reached that stage where he has passed from the status of a routine bookkeeper to that of being a part of management. In another connection having to do with the change from one situation to another, Chief Justice Marshall in the case of Brown v. State of Maryland, 1827, 12 Wheat. 419. at page 441, 25 U.S. 419, on page 441, 6 L.Ed. 678, by way of illustration stated: "The power, and the restriction on it, though quite distinguishable, when they do not approach each other, may yet, when the intervening colors between white and black, approach so nearly, as to perplex the understanding, as colors perplex the vision, in marking the distinction between them. Yet the distinction exists, and must be marked as the cases arise." In 25 Iowa Law Review 405, appears this statement: "We can easily see the two different colors, but we cannot easily discern where one ends and the other begins."

While it is easy to classify as such one who is purely a routine bookkeeper, and easy to classify a department head as being part of management, yet where there is gradual evolution from routine bookkeeping to becoming a part of management, and where there is a shading from routine duties into duties of management the task of distinguishing one from the other is not always easy. It would seem that in some cases there is what might be called a "twilight" zone in the gradual change from one to the other. There is nothing in the Fair Labor Standards Act that makes an employee's condition static so far as passing from nonexempt to an exempt classification is concerned, or in any way to indicate that an employee is "frozen" into one status or classification.

In both of these cases all parties rely upon and cite two documents having to do with interpretation of the Regulations relating to the "administrative" exemption, both of which are in evidence. One document is designated as "Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition," which is prefaced by the following:

"Statement of the Administrator

"The construction of Regulations, Part 541, as amended, which the Wage and Hour Division will follow in enforcing the act thereunder (unless and until the regulations are set aside in whole or in part by amendment or by authoritative decision of the courts) will be found in this Report and Recommendations.

"Philip B. Fleming,
"Administrator."

For convenience this interpretive bulletin will be hereinafter referred to as the Report.

The other document is an interpretive statement of the Administrator known as the Press Release of October 28, 1940, which will be referred to as the Release

On page 26 of the Report in connection with the $200 a month salary required in the "administrative" exemption, it is stated: " * * * it may be reiterated here that a salary criterion constitutes the best and most easily applied test of the employer's good faith in claiming that the person whose exemption is desired is actually of such importance to the firm that

he is properly describable as an employee employed in a bona fide administrative capacity." If the term "administrative" were not defined and delimited it would be considered to have been used in its general and ordinary sense. As used in that sense it would not have included a mechanic however highly paid. However, as pointed out on page 28 of the Report, if the administrative exemption were to be based alone on salary, it would allow the exemption to highly paid tool and die workers, cutters, and a number of others whose duties could not in any sense be considered as administrative in character. Therefore the Administrator, to avoid the inclusion of workers in the exemption who were merely receiving the requisite pay, but whose work was not in reality administrative in character, prescribed the additional requirements contained in the sub-paragraphs referred to.

On page 26 of the Report it is stated (italics supplied): "In the definitions of 'executive,' 'professional,' (and 'outside salesman') both as originally drafted and as proposed herein, there is a clause, in varying forms, barring an employee from the exemption if he performs a *substantial amount* of nonexempt work. *It is not proposed that a similar clause be included in the definition of 'administrative'.* It is believed that the employees in the administrative group are so heterogeneous in function that it would present a disproportionately weighty problem in administration to determine what constitutes nonexempt work. However, when this valuable guard against abuse is removed, it becomes all the more important to establish a salary requirement for the exemption of administrative employees, and to set the figure therein high enough to prevent abuse."

Thus, it clearly appears that the two employees in the instant cases cannot be denied their exemptions (if otherwise entitled to it) because they did a substantial amount of bookkeeping. In the case of Stanger v. Glenn L. Martin Co., D.C.Md., 1944, 56 F.Supp. 163, it was held that the performance of clerical work even up to forty-five to fifty per cent of the time was not fatal to the administrative exemption. The Court on page 168 of 56 F.Supp., states: "So, whether it was forty-five or fifty per cent of their time which, as they claim, they devoted to work of a clerical nature, or whether it was much less, is not conclusive of the issue before us. The

important question, as the Regulation of the Administrator sets forth, is the extent to which the exercise of discretion and independent judgment was involved."

There are certain words and terms used in the subparagraphs referred to which are not specifically defined, some of these are "general supervision," "responsible," "nonmanual," and "exercise of discretion and independent judgment."

In the instant cases it clearly appears that the two employees perform their duties under "general supervision." The supervision given them by their employers is extremely and noticeably general in nature, and very few office employees are as much "their own bosses" so far as their work is concerned as they are. It clearly appears that an employee in charge of and managing an office of a livestock commission firm is of the greatest importance in holding and building up a firm's good will and patronage, and upon such an employee is dependent the smooth functioning of the firm's operations. One witness described such an employee as a "liaison officer" between the owners of the firm and its patrons. One witness in an illuminating and reminiscent way compared them to "top-sergeants" in the army, who to a large extent can, the witness stated, "make or break" their commanding officers. Using further military terminology, it seems to be the view of the defendants that the two employees are in reality top-sergeants in the army of business, and that they are not merely privates drawing top-sergeants' pay. The evidence is clear that for an office-manager in charge of a livestock commission firm to satisfactorily perform the duties of manager requires specialized training, experience and knowledge, and a high degree of tact, diplomacy and good judgment. It is clear that the two employees in question are performing their duties as office managers in a manner highly satisfactory to their employers, and that they have such experience, tact, diplomacy and good judgment. The competition in the livestock commission business at the Sioux City Stockyards is vigorous, keen and aggressive. To conduct such a business with profit and success, old patrons must be well served and skilfully handled, and there must be a constant campaign for new business. The office manager of a commission firm plays a vital and responsible part in enabling a livestock commission firm to carry on a profitable and successful business.

978

As heretofore indicated, one of the points of vigorous controversy is the meaning to be given the term "non-manual work." The importance of the construction is made manifest by the testimony of the Regional Supervising Inspector who testified that if an employee did any manual work at all he could not be exempt as an administrative employee. It is then asserted and argued that the keeping of books is manual work, and that because the two employees in question do make bookkeeping entries, they are by that fact disqualified for the administrative exemption. It is the claim of the defendants that there is not involved the question of whether the doing of any manual work disqualifies an employee from the "administrative" exemption, because the keeping of books is not manual work, either as commonly and ordinarily understood or as construed by the Administrator.

█ It would seem that the term "manual work" is a somewhat broader term than "manual labor" in that "manual labor" is generally regarded as being a more heavy and laborious type of activity than "manual work." However, in the ordinarily and generally understood meaning of the term, a person keeping books is not regarded as being a manual worker. Persons engaged in keeping books are commonly and ordinarily referred to as being clerical workers and not manual workers. In the Report on page 28 it is stated that the employees exempted under the three sub-paragraphs have the common characteristic of being what is known as white collar employees. A case that bears somewhat on this question is the case of Arizona Eastern R. Co. v. Matthews, 1919, 20 Ariz. 282, 180 P. 159, 7 A.L.R. 1149, where there was involved the question of whether a billing clerk was within the provisions of a state employers liability act giving protection to those doing "manual labor". The Arizona Court on page 162 of the Pacific citation, states:

"One of the canons of interpretation of words used in a statute is that they must be taken in their common and ordinary sense, unless, from the context, it is evident some other meaning was intended. When we speak of a person doing manual labor, the mind is instantly directed to some kind of toil in which the physical predominates the mental. The words would never call to mind the office man engaged in keeping books or making out bills or statements or operating a typewriter."

█ That the Administrator does not regard the keeping of books as "manual work" under the Regulation would seem to be clear from page 3 of the Release where in dealing with the "administrative" exemption the Administrator states (italics supplied): "To take bookkeepers as an example: the ordinary bookkeeper performs routine work and thus cannot qualify for exemption. Furthermore, over 90 per cent of all bookkeepers are paid less than $200 a month and thus are automatically barred from exemption. There are, however, a few persons *whose work includes bookkeeping* who will be exempt. Characteristically the bookkeeper who is paid as much as $200 *also serves as an office manager* or performs other functions sufficiently important to justify the payment of what is a comparatively high salary. In these rare instances the *bookkeeper-office manager,* etc., *will meet all* of the requirements of the administrative definition."

Thus the Administrator clearly and definitely states that an office manager (who is paid not less than $200 a month) may also keep books and still be exempt as an administrative employee. The interpretation of the Regional Inspection Division that bookkeeping is manual work and that being manual work the doing of it is fatal to the exemption, is not in accord with the Administrator's statement. The Administrator's interpretation will govern.

█ It seems clear that in order to retain "administrative" status under the Act, it is not necessary that an employee be constantly and continuously engaged in exercising "discretion and independent judgment." In Section 541.3 relating to those employed in a "professional" capacity, it is provided that one of the requirements for that status is "the consistent exercise of judgment and discretion." The word "consistent" has been omitted in the Regulation relating to "administrative" status. The Administrator's statement that the doing of bookkeeping by an office manager does not of itself deprive him of "administrative" status, is consistent with the omission of the word "consistent" from the Regulation relating to the "administrative" exemption.

While the words "office manager" are not specifically defined by the Administrator, yet since he regards an office manager as having "administrative" status, it would seem that he regards an office manager as one who is in charge of an office working under only general supervision at respon-

sible work directly related to management policies or general business operations along specialized or technical lines requiring special training, experience or knowledge, and who can and does exercise discretion and independent judgment. It is believed that the two employees in question do meet these tests of an "office manager", and that they are both "office managers" in fact as well as in name.

The two employees in question testified as witnesses which gave an opportunity for close observation by the Court. It was plainly obvious that these men are not the routine bookkeeper type. Their conduct, mental reactions and bearing and appearances on the witness stand indicated they were keen, alert, quick thinking, able and capable young business men.

The parties cite a number of authorities. The case of Helena Glendale Ferry Co. v. Walling, 8 Cir., 1942, 132 F.2d 616, is cited by the plaintiff. The facts in that case are more fully set forth in the opinion of the trial court reported in 5 Labor Cases, # 60,994. From the district court opinion it appears that the maximum salary of the young women in question was $17.50 per week, so they obviously did not meet the first requirement of administrative exemption, i. e., a salary of not less than $200 a month. The plaintiff also cites the case of George Lawley & Son Corporation v. South, supra. That case had to do with the sufficiency of the evidence to support a jury verdict, which in effect found that the plaintiff was merely a combination bookkeeper and messenger who "paraded in the plumage of an administrative official." [140 F.2d 445] The plaintiff cites the case of Patton v. Williams, D.C.Okla. 1943, 61 F.Supp. 884. In that case the salary of the employee in question a bookkeeper in a stockyards office, was $150 a month which is again a case where the employee did not meet the salary requirement. The plaintiff cites the case of Wagner v. American Service Company, D. C.S.D. Iowa, 1944, 58 F.Supp. 32. That case involved the question of the status of a chief engineer as an executive, and did not involve the question of the administrative exemption. In addition Judge Dewey found that a large percentage of his work around the plant was manual labor. The plaintiff cites the case of Timberlake v. Day & Zimmerman, D.C.S.D. Iowa, 1943, 49 F.Supp. 28. That case had to do with the lieutenant or captain of some company guards. Judge Dewey held that as such guard officer the

plaintiff was not a bona fide executive or administrative officer of the company. The situation in that case is not sufficiently analogous to those in the instant cases to be of much assistance. The plaintiff also cites Moss v. Postal Telegraph-Cable Co., D.C. Ga., 1941, 42 F.Supp. 807. In that case the maximum pay was $30 a week. The plaintiff cites the case of Lorber v. Rosow, D.C. Conn., 1944, 58 F.Supp. 341. The Court in its findings of fact which appear in Labor Cases citation, states:

"23. The plaintiff's duties were to check the filling of customers' orders in the drug department. Salesmen brought in the orders. The plaintiff placed them in a pile on a stand. Workmen in the drug department took the orders from the stand, assembled the items, and placed them in bins, one order in each bin used. The plaintiff checked the items with the order, handling each item in checking into an adjoining bin. In cases of error, excess items were removed from the bins by the plaintiff and placed on a shelf above the bins. If an item was missing, the plaintiff called that to the attention of the workman who had filled the order, and the workman supplied the item omitted.

"24. The duties of the plaintiff in connection with the checking of customers' orders, as described in Paragraph 23, took about 80% of the plaintiff's working time each day."

In the opinion on page 344 of the Federal Supplement, in denying the administrative exemption the Court stated that the employee failed to qualify as an administrative employee "because of the manual nature of the greater part of his work." However, it would seem that the nature of the employee's work and the extent to which the employee exercised independent judgment and discretion in that case is not analogous to the situation in the instant cases.

The defendants cite the case of Distelhorst v. Day & Zimmerman, Inc., D.C.S.D. Iowa, 1944, 58 F.Supp. 334. In that case a claimant, one Robert J. Hazard, who was an assistant to the chief safety engineer, was held not to be included in the Act. However, that claimant's exemption was clearly based upon sub-paragraph (1) of Paragraph B, relating to those who assist those engaged in an executive and administrative capacity. The defendants in the instant cases claim exemption for the em-

ployees in question under sub-paragraph (2) of Paragraph B, and not under sub-paragraph (1). The defendants rely upon the case of Walling v. General Industries Co., D.C.Ohio, 1945, 60 F.Supp. 549, 550, in which an assistant paymaster was held to have met the requirements of the administrative exemption. However, that again is a case where the exemption was under sub-paragraph (1) of Paragraph B, and not under sub-paragraph (2). In that case it was stated in regard to the employee, "most of his working time was spent in operating and adjusting tabulating machines."

The defendants cite the case of Baird v. Associated Piping and Engineering Co., D. C. Cal., 1945, 61 F.Supp. 970. By that case an employee who was in charge of a division of his employer's business and who received from $300 to $350 a month, was held to be exempt as an "administrative" employee. The court in holding that the employee was such an employee referred to, among other things, that the employee "attended morning meetings with the executives, and made recommendations with respect to his department or division." The defendants cite the case of Horist v. Weco Products Company, D.C.Ill., 1944, 8 Labor Cases #62,182. In that case it was held that an employee hired for executive and supervisory work, was exempt under Section 13(a) (1) of the Act, even though in connection with his work he incidentally performed work of a laborious character.

The two employees in question both testified they were desirous of being classed as having an "administrative" status. While this is without legal significance, yet the reasons given by them and the testimony of the different livestock commission men, indicates an interesting crystallization of thinking on the part of some as to the "administrative" exemption. It is apparent that it is the view of some that to meet the rather high requirements of the "administrative" exemption, is a mark of distinction and a symbol of success. Among the reasons given for the desirability of the "administrative" exemption was that it brought the employees in closer contact with the members of the firm; that it gave them better standing and prestige with the firm's customers; that it made them feel they were successfully advancing. It would seem that the employees regard the attainment of "administrative" exemption as marking a graduation from one status to another; as marking a change from one "who merely works around the place," to one who has something to say about "running the place"; as a change from working by and with the clock, to flexibility of hours governed by the ebb and flow of business. It was evident from the testimony of the various livestock commission men who testified that they are paying what might be called a "premium" in the way of salaries to their office-managers in order to give them "administrative" status. This willingness seems to be occasioned by the desirability for flexibility in hours for such managers in a business subject to great variation in volume; and, because of the prestige and standing given such managers with shippers and others with whom they have business contacts; and, because of the morale effect upon such managers. It would seem to be a reasonable inference that in these types of cases the desire of the employers for "administrative" status for their office managers tends to be a protection to employees having such status against reduction of salary below $200 a month and operates as a protection to them against being placed on an hourly basis at a rate which even with overtime would give them less pay for the same or longer hours.

It is the holding of the Court that both of the employees in question in the instant cases are exempt from the minimum wage and overtime provisions of the Fair Labor Standards Act as bona fide "administrative" employees as defined by the Administrator. The defendant, Sioux City Livestock Commission Company, did prior to January 1, 1941, violate the provisions of the Act in not paying Mr. Johnsen the minimum salary of $200 a month. It is not shown that the defendant, Gehan Livestock Commission Company, has at any time violated the provisions of the Act in regard to Mr. Anderson. However, injunctions do not issue for the purpose of punishing past violations, but to restrain future violations. The plaintiff's ground for the injunctions is based upon the theory that the two employees in question do not have "administrative" status. The Administrator does not claim that any other violation is involved or threatened. It is the holding of the Court that the plaintiff's applications for injunctions in each case be denied, and that the cases be dismissed on their merits.