**BERNICK v. CODDON et al.**
Civ. No. 678.

District Court, D. Minnesota,
Third Division.

April 18, 1946.

Robins, Davis & Lyons, of Minneapolis, Minn., for plaintiff.

Stan Donnelly (of Oppenheimer, Hodgson, Brown, Donnelly & Baer), of St. Paul, Minn., for defendants.

DONOVAN, District Judge.

Milton Bernick sued under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., 52 Stat. 1060, for overtime compensation, liquidated damages and attorneys' fees.

It appears from the evidence that plaintiff commenced working for defendants on or about June 15, 1921, and progressed in ability, experience and increased wages as time went on. On October 24, 1938, plaintiff was receiving a weekly wage of $40. Commencing in January, 1939, he was paid $50 per week, to which was added a bonus, which made his weekly wages approximately $65. Employees who were called as witnesses in plaintiff's case, during the period we are here concerned with, received weekly wages of from $25 to $32.

From October 24, 1938, to April 18, 1944, the period we are here concerned with, the defendants (partners and owners of the business in which plaintiff was employed) were away from the business premises a good deal of the time.

A summary of plaintiff's testimony is as follows:

He commenced work when seventeen years of age as a janitor for defendants, who were engaged in the wholesale business of manufacturing and selling garments for men, receiving wages of $5 per week. His progress up to October 24, 1938, is unimportant here, except that during that time plaintiff acquired considerable experience in the business and became a skilled and valuable employee. Plaintiff testified that he had a key to the building wherein he was employed during the entire period for which overtime compensation is claimed, and was always the first to arrive and open up and the last to leave and close defendants' place of business. He describes his activities as making out "cutting tickets" (which defendants claim requires unusual skill and ability), filling orders, helping shipping clerks, assisting tailors, sweeping in the absence of the

janitor, packing and unpacking garments and woolen goods, shipping goods to other contractors for "make-up", placing garments on racks for delivery to tailors on different floors, and similar duties.

Plaintiff claims he would commence work at 7:30 in the morning and would devote a good part of the morning to "cutting tickets and filling orders", and the rest of the day would be devoted to the different tasks above enumerated. This would continue until he would close the shop at 6:30 o'clock, p.m. On Saturday he said he would leave at 5 o'clock p.m. The rule was that employees were allowed "one hour for lunch", but plaintiff maintained he was "too busy to take an hour for lunch and sometimes worked Sundays". No record was kept of plaintiff's claimed overtime.

With the change of seasons the work would increase and decrease, according to public demand for the goods being manufactured and sold by the defendants. Plaintiff describes his industrious habits in such a way as to make him a most unusual and devoted employee. On New Year's he was at work on the inventory, even though this was observed as a holiday, together with May 30th, July 4th, Labor Day, Thanksgiving, Christmas, and "two or three holy days".

Plaintiff commenced punching a time clock when the Wage and Hour Law became effective. The cards containing the "punched time" of plaintiff were not produced at the trial. In this connection plaintiff testified, "I was told by Charles Coddon or a girl in the office to punch the time clock * * * to watch the card so as not to work over 40 hours per week * *. I didn't punch the clock when I came and left * * * as I wasn't paid for that time * * *. When I was too busy with work to punch the clock the girl would fill in" the time with pencil to correspond to instructions that the workweek was not to exceed 40 hours.

Plaintiff testified that "from October 24, 1938, to April 18, 1944, there were five or six employees doing the same work as I was doing * * *. I had no title * * no desk * * * no telephone".

It is undisputed that during the period here in question the plaintiff was a very busy man. Defendants admit they were away a great deal of the time purchasing, selling and maintaining contact with the public, and that during a considerable part of the time during the six years we are here concerned with they were operating their business on all five floors of the building occupied by them.

Plaintiff claims that when either or both of the defendants were present on the premises they were in sole charge and were the only ones exercising discretion and authority; that in the absence of defendants plaintiff was without "title or authority" and there was "no boss". Plaintiff admits, however, that in the absence of defendants no one could give him orders, and that aside from plaintiff and defendants he did not know of any one else who had a key to the premises.

In 1941, the Wage and Hour Division of the United States Department of Labor made an investigation of defendants' records, with a view to determining whether the law had been complied with in the matter of paying overtime compensation to plaintiff and his fellow employees. Plaintiff does not deny he was interviewed, and in this connection testified that defendant Charles Coddon told him, " 'The Wage and Hour Division figured you have quite a lot of overtime coming,' to which I [plaintiff] said nothing". This testimony was followed by plaintiff going on to say that the quoted statement attributed to defendant Charles Coddon "may have been made by a girl in the office." "* * * Some employees were paid overtime" as a result of the Wage and Hour Division's investigation, and plaintiff continued, "I was not paid overtime" although "I explained to the Wage and Hour Division my duties".

Plaintiff never demanded overtime from defendants prior to the commencement of this action. There was an A.D.T. switch at the premises which plaintiff testified he operated when he entered and left the place of business. Punching the clock was not always required of him. During the time he was employed in 1944 his weekly wages totaled $75 per week.

On April 18, 1944, plaintiff advised defendants that he was "quitting" on his "doctor's orders".

Plaintiff's testimony relative to his being without judgment, discretion, title or authority, and that he was performing hours of work of the same nature as that performed by nonexempt employees in excess of twenty per cent of the number of hours worked in the workweek by such nonexempt employees, is denied by defendants. To quote defendant Charles Coddon's testimony, he described plaintiff as having

"complete charge of our business: His duties were to supervise; to watch the house. He was the boss of the place while I and my brother [defendant Nathan Coddon] were away. He had a key to the place * * * was to lay out the work for the employees and supervise the work. * * *. He had charge of all woolens. * * * He had authority to reject goods * * * order goods from the mills. * * He did this day in and day out. * * * His primary duty in this period was supervising, executive and managing of our business. * * * He had authority to hire and fire" and the manual work plaintiff did during this period was not in excess of "ten per cent". Defendant Charles Coddon went on to say that the foreman in the tailor shop was subject to plaintiff's orders and that during a work day plaintiff could come and go as he pleased and was "his own boss" and had "jurisdiction to do things in my absence. He did business by letter, telephone and telegram".

The only A.D.T. records available and introduced in evidence were those between November 29, 1943, and April 19, 1944, showing that plaintiff's place of employment was opened as early as 7:25 o'clock a.m. but most frequently was not opened until after 8 a.m. During the same period, with possibly nine exceptions, the place of business always closed at or about 6:30 p.m.

At the outset it should be emphasized that the sharp conflict in the testimony makes obvious the difficulty of determining what is true and accurate in the evidence here submitted to the trier of the facts. The only reliable record in evidence is defendants' Exhibit "A", the A.D.T. records referred to, and these aptly illustrate how inaccurate memory can be, and how ludicrous it is to be positive and emphatic about remote incidents and material facts, in the absence of supporting written records.

From admissions made, it may be assumed that the parties to this action were subject to the provisions of the Fair Labor Standards Act, and were engaged in the production of goods for interstate commerce.

■ The only issue in the case is this: Was plaintiff, from October 24, 1938, to April 18, 1944, within the exemptions to the Act? The answer to this question necessitates determination of the nature of plaintiff's work and duties, which are in dispute.

To say that the defendants in the present case would absent themselves for weeks at a time from a place of business made up of some five floors, wherein the manufacture of garments being vended from coast to coast was in process, without designating and placing some trusted individual, such as the plaintiff, in charge of that business during their absence, approaches too close to the ridiculous to invite confidence in such testimony by the Court. Plaintiff's attempt at self-effacement does not do justice to his ability and industry. From the record in this case it is obvious that plaintiff's judgment and discretion could not help but be of great value and benefit to his employers.

■ Precedents are not of much help. "Each case must stand on its own facts." Skidmore et al. v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164. As said by the Court in Peffer et al. v. Federal Cartridge Corporation, D.C., 63 F.Supp. 291, 295, plaintiff "evidenced a studied attempt to minimize [his] responsibilities * * *. * * * Undoubtedly, each case of its kind must be decided on its own merits. The decisions in other cases are not particularly helpful * * *."

The Court is of the opinion that plaintiff, like many another conscientious person, was imbued with enthusiasm about his work, and concerned most with doing it well. He made no point of the failure of the Wage and Hour Division to single him out as one entitled to additional compensation. He left defendants' employment because of ill health and at the direction of his doctor.

The law applicable is Section 13 (a) of the Act, 29 U.S.C.A. § 213 (a), which provides in part: "The provisions of sections 206 and 207 of this title [pertaining to minimum wages and maximum hours] shall not apply with respect to (1) any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator); * * *."

■ The regulations issued by the Administrator have been held to "have the force of law as much as though they were written in the statute." Helliwell et al. v. Haberman, 2 Cir., 140 F.2d 833, 834; Snyder v. Wessner, D.C., 55 F.Supp. 971.

That plaintiff performed many tasks and did much work that was nonexempt may well be so. The cogent question is, did such nonexempt work exceed the twenty per cent limitation? The Court is of the opinion that it did not.

Defendants have the burden of proving their claim that the employee was exempt under the Act. George Lawley & Son Corporation v. South, 1 Cir., 140 F.2d 439, 151 A.L.R. 1081. Plaintiff was paid $300 per month at the time he discontinued work for defendants on his doctor's orders. Without doubt, plaintiff had "to settle many problems and questions in the exercise of discretion and independent judgment" during the frequent and long absences of defendants from their place of business. Peffer et al. v. Federal Cartridge Corporation, supra. The Court concludes plaintiff was exempt.

The burden was upon plaintiff to establish by a preponderance of the evidence the number of hours worked and the amount of wages due him, and for which this action is brought. Johnson et al. v. Dierks Lumber & Coal Co., 8 Cir., 130 F. 2d 115; Johnson v. Blankenship, 8 Cir., 152 F.2d 99. The Court is of the opinion that plaintiff has not carried this burden.

Defendants may submit findings of fact and conclusions of law in keeping with the views here indicated.

An exception is reserved to plaintiff.