**WALLING, Administrator of Wage and Hour Division, U. S. Dept. of Labor, v. SNYDER MIN. CO.**

**Civil Action No. 575.**

District Court, D. Minnesota, Fifth Division. July 2, 1946.

James M. Miller, Regional Atty., Wage and Hour Division, U. S. Department of Labor, of Minneapolis, Minn., for plaintiff.

Donald D. Harries and W. K. Montague, of Gillette, Nye, Harries & Montague, all of Duluth, Minn., for defendant.

DONOVAN, District Judge.

Plaintiff brings action pursuant to Section 17 of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C.A. §§ 201–219, which, for convenience, will be referred to herein as the Act, to enjoin defendants from future violations of Sections 7 and 15(a) (2) relating to overtime, Sections 11(c) and 15(a) (5) relating to keeping of records, and Section 15(a) (1) relating to shipment of so-called "hot" goods.

The claimed violations have to do with the employment by defendant of Walter Sibbald of Duluth, Minnesota, Provis T. Perry of Hibbing, Minnesota, and Stanley Hill of Chisholm, Minnesota.

Defendant denied violations of the Act and by affirmative plea in its answer alleged that each of said employees was employed in a bona fide executive and administrative capacity, as specified in the Act and defined in regulations issued pursuant thereto by the Administrator.

Subsequent to answering and prior to the trial, a stipulation of the parties was filed, providing as follows:

Said employees "were employed by defendant for hours in excess of the statutory maxima specified in Section 7 of the Fair Labor Standards Act.

"The defendant did not make, keep and preserve a true and accurate record of all said excess hours worked by said employees.

"The defendant did not compensate said employees for said excess hours at time and one-half said employees' regular rate of pay or at any rate greater than the straight monthly salaries at which they were employed.

"Defendant's employees Provis T. Perry and Stanley Hill were employed by defendant at Webb Mine and Shenango Mine, respectively, and that they are engaged in occupations necessary to the production of iron ore by defendant for interstate commerce; defendant's employee Walter Sibbald is employed at Duluth and his work for defendant is also necessary to the production of iron ore for interstate commerce. The iron ore so produced by defendant and its employees is shipped to points outside the State of Minnesota."

Said stipulation disposed of all issues for determination by the Court except the issue of exemption under Section 13(a) (1) of the Act, as raised by defendant's answer.

At the trial it was conceded that each of said employees was compensated for services on a salary basis of not less than $200 per month. The work of said employees is summarized as follows:

*Walter Sibbald*

Sibbald was employed in a dual capacity, working as a vessel agent from April 1st to December 1st, and as a clerk in the Duluth office of defendant from December 1st to April 1st of each year. He was paid $263 a month and had been employed for twenty-two years.

He would name the boats desired for cargoes of iron ore, stored in the docks at the head of the Lake, in grades and tonnages ordered by him to meet requirements of defendant's Cleveland office. He would tell the grading department at Chisholm, Minnesota, the grade of ore preferred, when he had information furnished by the Cleveland office to the effect that a boat would arrive on a certain date. He would obtain such information relative to the arrival of a boat from four to six days prior to the docking of the boat. The ore was graded and loaded in compartments of the boat. Defendant usually shipped two grades of ore which it was required to furnish according to analyses provided by contract. Sibbald had the duty of seeing that the analysis was met, if his employer was to make money under the terms of the contract. If a desired grade was not in stock, this employee would advise the Cleveland office the particular grades and tonnage that could be furnished for a certain period of time. His work necessitated that he keep advised of the movements of the boats, and to this end he was in regular communication by "ship to shore phone" with the captain of each boat. The captain would want to know what cargo he was going to take on and where he was to "spot" the boat at the ore dock. For instance, if the captain knew beforehand whether his boat would be loaded on the starboard or the port side, this information would speed up operations, for the reason that the hatches on one side of the boat only would be opened. In ordering grades of ore from Chisholm, Sibbald's judgment would be accepted over that of the ore grader. Sibbald would also make all arrangements at the ore dock for the storing of the ore there, and for the loading of the boat, upon its arrival. He advised to whom the ore was consigned and where the bill of lading should be sent. He also would arrange for any repairs that the vessel might require upon arrival. This usually was done by "ship to shore phone call" from the captain, and if supplies were needed for the boat, Sibbald would make arrangements therefor. He would pick the type of mechanics or craftsmen to do the repairing, and he would order lumber, engineer's supplies, boiler compounds, oil, coal and similar necessary supplies requisitioned by the boat captain. If the boats required the employment of members for the crew at the head of the Lakes, he would

arrange with the Lake Carriers' Association for such men. When the boat was loaded and ready to leave port, Sibbald would advise the Cleveland office of its departure, furnishing the grading and tonnage of ore carried. He also would advise the treasurer of the railroad whom to bill for the freight carried by it from the mines to the docks. He acted as a sort of dispatcher at the ports of Duluth and Superior.

His work as an assistant to the auditor was more or less clerical, in the performance of which he was assisted by four stenographers. The work in the Duluth office consisted of what he called "cost accounting", in which Sibbald was engaged in distributing the costs. He also decided how labor should be classified in the accounts, and would do whatever was necessary in the taking care of employees' group insurance records.

Sibbald had nothing to do with deciding to whom the ore should be sold. He made up vouchers in longhand and would have one of the girls employed in the office type them. He had nothing to do with the determination of production at the mines. He made book entries, and the girls working in the office also did that sort of work. At times he would assign work to the girls in the office. Part of the time he had an assistant as vessel agent, who kept record of the analysis of the ore, and would do "general telephoning, notifying of boat arrivals and things of that nature."

Sibbald's time was divided about equally between his duties as vessel agent and those of a clerk engaged in the performance of general office work. He said:

"The way the work is interspersed it is very hard to say just how much time I put on the boats and how much time is put in on general office work. * * * As I say, I don't keep a record."

Sibbald's superior, Mr. E. J. Maney, defendant's General Manager, summarizes this employee's duties in this manner:

" * * * Mr. Sibbald, acting as vessel agent, has to allocate the boats, get full information in connection with the iron ore that might be available to load them, and take up matters with the railroad that will assure this ore being loaded in certain parts of the docks where there will be no question about the boat getting proper despatch, and, of course, the despatching of boats engaged in Lake Superior trade and the iron ore trade especially. It is very important in that the season is rather short and we must do everything to avoid any delay at any of the docks at this end. * * * he [Sibbald] has to use his own judgment in many matters * * *."

*Provis T. Perry*

This employee has been defendant's chief clerk at its Webb mine at Hibbing. Defendant employs between 175 and 260 men at the Webb mine.

Perry's superior at the mine was the Superintendent, John J. Maney. He reported to said Superintendent, and to Mr. B. C. Anderson, the defendant's Auditor at Duluth. Perry had no authority to "hire or fire".

As chief clerk, Perry was provided with books and forms for the purpose of keeping defendant's accounts and records at the Webb mine, and making reports to its Duluth and general offices. He had one man working under him at the mine, who kept and made a record of the time worked by the mine employees, attended to personnel records, such as applications for employment from which the timekeeper made out cards for the files, and performed similar duties.

Perry had no authority to rule on the qualifications of employees for any purpose. Such matters were in charge of the Superintendent. He would interview callers at the mine office and answer inquiries from members of employees' families relative to earnings of such employees, or put off or evade answering individuals he thought were not entitled to such information.

He also had charge of deductions from wages earned by employees at the mine, such as medical, premiums for group insurance, advances of money on occasion to deserving employees (with reference to such "loans" he sometimes consulted with the Superintendent), and in all such cases the Superintendent would sign the check. Perry would also figure or prepare the contracts for the miners, which is purely

a clerical matter. "Contract miners" are paid a fixed price per ton of ore produced, or a certain price per foot for "drifting", which, in ordinary language, means cutting a tunnel through ore, rock, or other material. The amounts charged for mining supplies, such as powder and fuses, would be deducted or charged against the particular contract. The result, as described by Perry, is that "you divide the money [earned by the miner in his place of work] by the shifts [worked] and it gives you the rate per day, and pay him [the miner] the number of days that he has worked."

If an employee presented an assignment of wages to defendant, Perry made the decision to honor or reject it. He furnished the auditor at the Duluth office with information called for in garnishment proceedings, but he did not make the disclosure. One of his duties was to advise returning "veterans" as to their "status" as former employees. He also attended to accident records, made out reports in connection therewith and sent them to the Duluth office, keeping one copy for the local mine office. He also performed work in the matter of assembling information and forwarding it in connection with so-called "Social Security." He also made up "withholding tax receipts," "Old Age Benefit Tax receipts," and deducted the taxes required by State and Federal laws.

Perry has been employed by defendant as a "mine clerk * * * making up the payrolls and time sheets, accident reports * * *, [acting as] paymaster, * * * [making] daily labor reports, pit reports, shop and team sheets * * * accident reports * * * [posting] the payroll, * * * [taking] care of the correspondence to the Duluth office, * * * [making] the deductions * * *." He made out numerous other reports and records in connection with defendant's mining operations at the Webb mine.

The work of Perry was almost entirely a matter of cost accounting, posting and reporting from information furnished by individuals employed at the Webb mine, such as the Superintendent, mine captain, a variety of bosses, shovel engineers, miners, and the like.

Perry has been employed as a mine clerk since April, 1918, for which he is being paid $210 per month.

*Stanley Hill*

Hill was employed by defendant since 1933 or 1934 as "chief clerk" at the Shenango mine, for which he was paid $210 per month. He had no one working under him and described his work as "picking up all the daily reports, putting them on a labor classification, entering the time of all employees in the time book, and entering from them to the payrolls, and making out different reports, sending them to Duluth". He would use some judgment in classifying the work of employees by personal observation and knowledge. To illustrate, he testified:

"* * * I seen the bulldozer working on the stockpile grounds so I just charged it to item 5, which is under the proper place. * * * I make my rounds of the shop in the morning and the afternoon. * * * I just note the work of the different fellows, what they are working on * * *. The foreman should put the work that was done [in his report], it should be right, but sometimes if it is wrong I make a correction * * *."

He also would type the leases in connection with the renting of houses to employees at the mine, and report to the Duluth office on the condition of the 40 to 43 rented houses. He also made out accident and like reports and forwarded them to the Duluth office. He had 20 to 25 forms of classification, of different types and colors, and many reports to make out, calling for information from records in his office. He made a record of qualifications for work given by applicants and issued checks and made out the payroll semi-monthly.

There are about 91 employees at the Shenango mine, and Hill devoted half of his time "working on all the reports and payrolls and that, and rechecking * * *." He had nothing to do with the purchasing of supplies. He was furnished with a $20 petty cash fund to "buy little things for the office." He paid the employees by check at the office and advised them of deductions made.

As an example of the exercise of some discretion in connection with his work, Hill described the situation he was confronted with following "V–J Day." He testified:

"V–J Day happened the day before. * * * I didn't know whether they were going to tell the fellows to go home and * * * President Truman—he didn't know what to do and nobody else knew what to do, so I says, 'I will give them all a shift' and correct it the next half. * * * And that is what I did, and then I corrected it the next day. * * * Anderson [the Auditor at Duluth] asked me what I had done. I told him I gave everybody a shift and when the Government makes up their mind what they are going to do, then we will correct it. But he says to rechange it and make it over."

He had no authority to "hire or fire."

The foregoing is descriptive of the work performed for defendant by the three employees here in question.

Were the employees Walter Sibbald, Provis T. Perry and Stanley Hill exempt from the overtime provisions of the Fair Labor Standards Act, by reason of their being employed in bona fide administrative capacities?

Defendant is engaged in the mining and production of iron ore in Minnesota, and the shipment of iron ore by lake carriers. The employees above-named have been considered by defendant as exempt from the Act, which presents the one question here in issue.

■ The Regulations of the Administrator have been held to have the force of law as much as though they had been written in the statutes. Skidmore et al. v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124; Snyder v. Wessner, D.C., 55 F.Supp. 971; Walling v. Yeakley et al., 10 Cir., 140 F.2d 830.

The Regulation controlling the issue in the case at bar reads as follows:

"Section 541.2—Administrative.

"The term 'employee employed in a bona fide * * * administrative * * * capacity' in section 13 (a) (1) of the act shall mean any employee—

"(A) who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities), and

"(B) (1) who regularly and directly assists an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), where such assistance is nonmanual in nature and requires the exercise of discretion and independent judgment; or

"(2) who performs under only general supervision, responsible nonmanual office or field work, directly related to management policies or general business operations, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment; or

"(3) whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations involving the exercise of discretion and independent judgment; or

"(4) who is engaged in transporting goods or passengers for hire and who performs, under only general supervision, responsible outside work of a specialized or technical nature requiring special training, experience, or knowledge, and whose duties require the exercise of discretion and independent judgment."

Defendant contends that Walter Sibbald, employed as vessel agent and chief clerk in Duluth, is exempt under Section 541.2 (A) plus either of the alternatives (B) (1) or (B) (3), and that Provis T. Perry and Stanley Hill, both of whom were employed as chief clerks at the mines, are exempt under Section 541.2 (A) and (B) (1).

■ Defendant has the burden of proof in respect to its claim that the employees named are exempt under the Act. Helena Glendale Ferry Co. v. Walling, 8 Cir., 132 F.2d 616; Smith et al. v. Porter et al., 8 Cir., 143 F.2d 292; Snyder v. Wessner, supra; Anderson et al. v. Federal Cartridge Corporation, D.C., 62 F.Supp. 775; Bernick v. Codden, D.C., 65 F.Supp. 89.

■ Approach to the problem presented in the instant case must be made with the thought that:

"The Fair Labor Standards Act was designed 'to extend the frontiers of social progress' by 'insuring to all our able-bodied working men and women a fair day's pay for a fair day's work.' * * * Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those *plainly and unmistakably* within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people." (Italics supplied.) A. H. Phillips, Inc., v. Walling, 324 U.S. 490, page 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095, 157 A.L.R. 876.

Or, as expressed by the Court in Helena Glendale Ferry Co. v. Walling, supra, 132 F.2d page 619:

"Since the statute is remedial, and by its terms includes every employer and every employee coming within the broad scope of its coverage, the section granting exemptions is to be, construed strictly against those claiming them."

[5] The character of the work performed by the employees, as disclosed by the record, rather than by the titles of "vessel agent" and "chief clerk," is the controlling factor in the case at bar.

The Regulation of the Administrator above quoted is the yardstick the Court must use in measuring the relevant facts to determine whether any one or all of the three workmen came within the term of being employed in a "bona fide * * * administrative * * * capacity," and hence exempt from the application of the Act.

It is conceded that the three employees' work was "nonmanual." The important question is this: Did their work require the exercise of "discretion and independent judgment" by them, within said Regulation 541.2 (A), (B) (1) or (B) (3)? Burke et al. v. Lecrone-Benedict Ways, Inc., D. C., 63 F.Supp. 883.

■ In the opinion of the Court the employee Walter Sibbald qualifies as one working "in a bona fide * * * administrative * * * capacity." His employment, and the duties connected therewith require "the exercise of discretion and independent judgment." It is my opinion that defendant has carried its burden of proof establishing that Sibbald comes within the exemption of the Act. Snyder v. Wessner, supra; Walling v. Newman et al. and Gehan et al., D.C., 61 F.Supp. 971.

■ The record in the instant case does not impress me that the remaining two employees, Provis T. Perry and Stanley Hill, are exempt. While it is true that their work was nonmanual, in the sense that it was clerical and mental in contrast to physical effort, in my opinion the judgment and discretion claimed for them by defendant is not that contemplated in said Section 541.2, as set forth above. Their work, in a broad sense, was nothing more or less than ordinary routine bookkeeping, and was almost mechanical and automatic. The system and methods used by them required no administrative judgment or discretion. It was almost entirely a matter of routine that required the use of forms that had to be slavishly adhered to. No independent judgment was called for in the doing of their work, by Perry and Hill. Their duties can hardly be said to be such as to require the exercise of discretion or judgment so as to make them exempt. The one instance described by Hill as an exercise of judgment and discretion was reversed the next day by his superior.

The title of "chief clerk," under circumstances different from those outlined in the record of this case, may very well be descriptive of the head of an office or department, with subordinates looking to such "chief clerk" for orders or guidance—one, who, in a proper case, may be exempt as one employed in "a bona fide * * * administrative * * * capacity"—but Perry and Hill are not in that class. Their work appears from the record to be of such character as not to call for "discretion and independent judgment," in the sense contemplated by the Administrator in the Regulation referred to, and defendant has not carried its burden of proof in that respect.

As stated by the Supreme Court of the United States in Skidmore v. Swift & Co.,

supra [323 U.S. 134, 65 S.Ct. 164], with reference to this type of case, "Each case must stand on its own facts." I am convinced that the duties of Perry and Hill are entirely clerical, and construing the section granting exemptions to defendant strictly, as required by law, necessitates the extending of the benefits of the Act to Provis T. Perry and Stanley Hill. Their administrative duties, if any, were closely controlled and supervised. Geo. Lawley & Son Corporation v. South, 1 Cir., 140 F.2d 439.

The present case is one in which the employer undoubtedly acted according to its best lights and in entire good faith. No subterfuge was practiced; no evasive scheme was resorted to. Defendant was within its rights in assuming that said employees were exempt. That defendant's assumption was erroneous in no manner reflects upon its good faith.

Plaintiff's prayer for an injunction will be granted as to Provis T. Perry and Stanley Hill, and denied as to Walter Sibbald.

An exception is reserved as to each party herein.