**DUGAS et al. v. NASHUA MFG. CO.**

**Civil Action No. 355.**

District Court, D. New Hampshire.

Oct. 11, 1945.

Hamblett & Hamblett, of Nashua, N. H., and Louis E. Wyman, of Wyman, Starr & Booth, all of Manchester, N. H., for Nashua Mfg. Co.

.Karl E. Dowd, of Nashua, N. H., for Dugas et al.

CONNOR, District Judge.

This action is brought by Charles A. Dugas and seventeen others against the Nashua Manufacturing Company, to recover from the defendant unpaid overtime compensation in the amount of Six Thousand, Three Hundred Seventy-One Dollars and Eighty-Nine Cents ($6,371.89), alleged to be due under Section 7 of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C.A. §§ 201–207–216, and an additional equal amount as liquidated damages, together with reasonable attorney's

fee and costs of this action as provided in Section 16(b) of the Act.

The complaint alleges that the defendant employed plaintiffs for workweeks longer than the applicable maximum number of hours under Section 7, and in violation of said section, failed and refused to compensate them for such employment in excess of such applicable maximum number of hours in such workweeks, at rates not less than one and one-half times the regular rates at which they were employed.

The complaint further alleges that the work of the plaintiffs constituted the production of goods for interstate commerce within the meaning of the Act.

The defendant in its answer denies the allegations of employment and unpaid overtime compensation and further answers that the plaintiffs were employees of the Police Commission of the City of Nashua.

Jurisdiction is conferred on the Court by Section 16(b) of the Act, 29 U.S.C.A. Section 216(b).

### Findings of Fact.

There is no serious dispute as to the essential facts. The defendant, The Nashua Manufacturing Company, is a New Hampshire corporation having its place of business in Nashua, New Hampshire. It is engaged in the manufacture of cotton goods, woolen blankets and war materials of cotton and wool. Substantially all the goods manufactured by the defendant have been produced for interstate commerce, and have been sold, offered for transportation, transported, shipped and delivered in interstate commerce from the defendant's plant at Nashua, to various points outside the State of New Hampshire.

During the period beginning January 8, 1942, and ending March 30, 1944, and subsequent to the effective date of the Fair Labor Standards Act of 1938, the plaintiffs acted as armed guards at the defendant's plant, their duties being to protect its property, prevent sabotage and trespassing, and to perform all work in connection therewith.

The defendant, through its officers, entered into an arrangement with the Police Commission of the City of Nashua to furnish defendant with certain protective measures in the way of armed guards, to man its gates and maintain protection over its property and supervision of employees and others who had occasion to enter upon its premises through these gates.

The inducing factors which prompted the defendant to seek this service were the suggestions and insistence of the U. S. Army that such steps be taken, it apparently being its policy that contractors engaged in the manufacture of war materials initiate the program of protection outlined above.

The Police Commission of the City of Nashua is a part of the government of said city, appointed by the Governor with the approval of the Executive Council. While a part of the city government, it is not an agent of the city, but an independent governmental body, charged with the duty to appoint police officers, constables and superior officers, as they in their judgment deem necessary, and to fix their compensation.

Other than as above stated, it has no duties or functions. At the onset of the war, the Commission had already entered into arrangements with other industrial concerns in the City of Nashua to provide guards for their plants, and this situation obtained when the defendant took up the matter with the Commission to provide guards at its plant. The defendant indicated the number of guards it would require, (a total of 15) at its various gates, that a twenty-four hour service for seven days each week was necessary, and informed the Commission that it would pay whatever expense incurred. In addition thereto a service charge of fifty cents per man per week was agreed upon between the defendant and the Commission. No pay scale was proposed by the defendant, and the Commission fixed the daily wage as four dollars, with one day off in eight, which was the prevailing pay for special police officers. While this was the initial rate fixed by the Commission in respect to the men engaged, later a change in the wages was made by the Commission at the suggestion of the defendant. The wages paid to armed guards furnished to all the industrial plants was not uniform. The Commission undertook to hire the guards, they to furnish their own uniforms, but the Commission to furnish badges, twisters, flashlights, night sticks and revolvers, etc. Each applicant was required to fill out an application addressed to the Board of Police Commissioners in applying for the position of police officer. He was given a cursory examination and if found qualified was administered the oath customarily given the members of the police force by the Commission. He then received instructions

as to his duties, a post of duty was assigned to him, and a schedule of working hours arranged. The arrangement entered into between the Commission and the defendant lacked the formality of a written agreement, but resulted from various conferences between the officers of the defendant and the members of the Commission. The guards entered upon their duties January 8, 1942, and were under the general supervision of Commissioner Legasse, who was designated by the Commission to supervise this undertaking. They were required to examine the passes of the employees or others who sought admission at the gates, and during the night shift to report hourly to the police station. As time went on certain other incidental work was required of them, such as the recording of all license numbers, and other information concerning trucks entering or leaving the gates, the supervision of the parking area within the yard, and the relaying of messages by a bell system, in the event the presence of certain executives of the defendant was required. The Commission billed the defendant each week for the police protection rendered, together with the service charge, and the defendant forwarded the funds necessary to cover the charges. The hiring, discharge and control over these guards was wholly in the hands of the Commission. It was within the power of the Commission to assign these men to similar duty at plants owned by other concerns, if it deemed best, and ordered the guards to other duties, such as fires, blackout protection and parades, all unrelated to the business of the defendant.

There is no evidence that the defendant was consulted in the matter of the individual hiring or discharging of any of the guards, and in no way supervised or directed their work, or controlled their activities, other than that upon widely separated occasions it did make suggestions to the Commission as to changes beneficial to the general conduct of the affairs of the company, related to the program of protection.

Sometime in 1942, as a result of a ruling of the War Labor Board, the employees of the Company received a wage increase of seven and one-half cents an hour, retroactive to June 15, 1942. The defendant decided to give all of its employees not covered by the order a similar increase. It took up with the Commission the matter of providing the armed guards with a like increase with effective retroactive date, and stated that it would be willing to reimburse the Commission for the increased expense if the Commission was agreeable to make such wage revision. The Commission acceded to this suggestion in part, and a pay raise of four dollars per week per man resulted.

This arrangement between the defendant and the Commission continued until March 30, 1944, at which time the defendant was notified by the military authorities that armed guards would no longer be required. The defendant in turn so advised the Commission, and the men were discharged by it accordingly, and the arrangement terminated.

### Conclusions of Law.

No claim is made that an employer-employee status existed by virtue of any express contract between the plaintiffs and the defendant. If any recovery is to be had by the plaintiffs, it must be based upon a principal and agent relationship. The plaintiffs urge that such situation did in fact exist and that the Police Commission of the City of Nashua was acting purely as an agent of the defendant in the engagement of them to act as armed guards on the property of the defendant. It is the contention of the defendant that the Police Commission was acting in the role of an independent contractor; that the whole undertaking was in that category, with the defendant divesting itself of all control or concern with the details and manner by which the objective would be accomplished and interested only in the result.

With the foregoing and opposite contentions in mind, consideration must be accorded to the basic legal principles thus involved and their application to the evidence.

The purposes and aims of the Act are social and remedial. It was not its purpose to create new wage liabilities, but where such existed, to measure them by the standards fixed by law. The usual and accepted concept of employer and employee relationship which has heretofore been recognized as fundamental in defining the elements necessary to its creation, still prevails, unimpaired and unchanged. This legislation was not intended to abrogate these principles, either in letter or in spirit, and while the rights of the employee were to be carefully guarded, the substantive law remained untouched.

It is essential that the status of principal and agent and that of independent contractor be defined. A concise definition to be found in Restatement on Agency, Section 1, reads: "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."

"Agent" is a term used to describe a person authorized by another to act on his account and under his control. "Principal" is a term used to describe a person who has authorized another to act on his account and subject to his control.

Again in the same Restatement, Section 2, Sub-section 3: "An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking."

Taking up first the question of whether the situation presented in this action permits a finding of a principal and agent status, certain tests are to be considered and weighed in determining whether such relationship did in fact exist. In this connection it seems proper that the reasons prompting the defendant to enter into this arrangement above described be examined.

It is urged by the plaintiffs that the defendant sought by this method to evade the application of the Fair Labor Standards Act. The Court is unable to subscribe to this suggestion, having in mind that the defendant employed approximately five thousand persons in its plant. It is incredible that it would undertake to evade compliance with the Act in respect to fifteen guards in order to avoid inconsequential expense.

Accordingly it is the ruling of the Court that no evasion of the terms of the Act was intended, and no subterfuge resorted to by the defendants, nor did any collusive arrangement exist for that purpose between it and the Police Commission.

It is the opinion of the Court that the defendant in undertaking to comply with the requirements of the military, sought to have these men provided by an outside entity, and thereby divest itself of all control and responsibility for the presence of armed men on its premises and the tortious consequences which might ensue.

The arrangement which was finally entered into was first broached shortly after the outbreak of the war. The defendant indicated to the Police Commission the number of guards required, the property to be covered, and the schedule of working hours. There is no evidence that the Commission attempted or consented to act in a representative capacity, nor did it do anything in the name of the defendant. It did not hire any person as an employee of the defendant, nor is there any evidence that it considered itself subject to the defendant's control. All of the plaintiffs made application to the Police Commission on the usual printed application form, and were sworn in as special officers, clothed with the authority as such.

While it is true that the relationship of principal and agent is not defined or created by what the parties thereto wish to declare it, the essentials above outlined must be recognized and applied. The evidence points more strongly to a situation creating an independent contractor status, and as such is a negation of a principal and agent relationship. Again, certain tests are to be examined and applied in order to determine whether such exists. One of the important elements to be considered is that of control; another is the right to hire and discharge; a further test is the question of supplying tools with which to perform the work, and still another is the obligation of the payment of wages.

An independent contractor is a person who, in the pursuit of an independent business, undertakes to do a specific work for other persons, using his own means and methods, without submitting himself to their control in respect to all its details. The true test of a contractor would seem to be that he renders service in the course of an independent occupation, representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished. Kentucky Cottage Industries v. Glenn, D.C., 39 F. Supp. 642.

"Ordinarily, where one employs another to execute a piece of work, and the one so employed has the right to select his own assistants and help, the employer having no control over the hands of the employé, and no right to direct the manner in which the work shall be done, other than to require that it shall be done in accordance with the specifications under which it is contracted

to be done, the one so contracted with is an 'independent contractor.'" Lexington & E. R. Co. v. White, 132 Ky. 267, 206 S.W. 467, 471.

The existence or absence of power on the part of an employer to terminate the employment at any time, or to control the conduct of the employment by interrupting the work or changing the employees from one task to another task before the first task is completed, is one of the most decisive elements to be considered. The existence of such power on the part of the employer is compatible with the relationship of employer and employee; the absence of such power is indicative of the relationship of the independent contractor. Bowen v. Gradison Construction Co., 236 Ky. 270, 32 S.W.2d 1014.

In Walling v. Sanders, 6 Cir., 136 F.2d 78, 81, is to be found this very concise statement: "The usual test by which, in common experience, men determine the employer, is to ascertain who has authority on his own account to 'hire and fire.'"

In the instant case there is abundant evidence that the defendant exercised no control over the plaintiffs, took no part in their hiring, nor was consulted or acted concerning the discharge of any of the guards so engaged. On the contrary, the Commission had full control over the activities of these men during their working hours, assigning them to their posts, promulgating their rules of conduct and duty, and in fact did assign some of them to other industrial plants in certain instances. The Commission furnished them with full equipment, such as badges, night sticks, revolvers, flashlights. The defendant supplied them with nothing. The plaintiffs looked to the Commission for payment of their wages as an obligation on its part.

While certain requests as to the details of the work were transmitted by the defendant to the Commission, and subsequently complied with, I do not find that they were of sufficient importance or significance to warrant adoption of the plaintiffs' contention.

Most if not all of the suggestions were initiated by the military and in cooperation therewith were passed on to the supervisory body for action. Nor did the suggestion of the defendant to the Commission, that the increase accorded to all other employees be made available to the guards, which was not fully accepted by the Commission, alter the character of the arrangement or create an employer and employee relationship.

Certain other incidents, such as the continuance of group insurance and the payments of vacation pay to some of the plaintiffs previously or subsequently employed beyond the period under consideration, do not appear to be sufficiently important to aid in determining the issue. Judged by the usually accepted concept of principal and agent and employer and employee, it is my conclusion that the Police Commission acted in the capacity of an independent contractor rather than that of agent. Excepting only the fact that the renumeration might be in a greater sum than the service charge paid to the Commission, an entity or instrumentality specifically engaged in the business of furnishing armed guards or detective service would stand upon no different basis than that which must be accorded the status of the Police Commission. Both would be clothed with all the attributes common to the independent contractor status, such as control over the details, the hiring and discharging, and the right to direct the activities of the individual so engaged. The surrender of these prerogatives by the defendant would of necessity occur in dealing with a firm engaged in furnishing such service as it did occur in the instant case.

It is urged by the plaintiffs that in interpreting the Act, the technical common law concept of "employer and employee" is not to be the standard determinative of whether certain individuals are brought within the terms of the Act. The Court, upon examination of the pertinent sections of the Act and the interpretation accorded thereto by the several holdings of our courts, is unable to accept the broad implication of this contention. 29 U.S.C.A. § 203, defines "employer", "employee" and "employ" as follows:

"(d) 'Employer' includes any person acting directly or indirectly in the interest of an employee. * * *

"(e) 'Employee' includes any individual employed by an employer. * * *

"(g) 'Employ' includes to suffer or permit to work."

The leading cases dealing with the meaning of these definitions appear to be those of Maddox v. Jones, D.C., 42 F.Supp. 35, 36, and Bowman v. Pace, 5 Cir., 1941, 119 F.2d 858.

852

In Maddox v. Jones, supra, is found the following language: "The definition of 'employer' in [this section] as 'one acting directly or indirectly in the interest of an employer in relation to an employee' means that there must be a contract of employment to constitute the relationship of employer and employee. * * * This court is of the opinion that the definitions in the Act were not intended by Congress, however moved it was by humanitarian impulses, to destroy the well founded and long established rules fixing the status and affecting the relationship of employer and employee in actions based upon that relationship. It is not the province of courts to give the words used in the statute a strained or unreasonable meaning. It is difficult to believe that Congress intended to make the employee an employer or to change the relationship existing between one who has obligated himself to pay, and another obligated to labor for such pay. A court should not, by a masterly use of words or by twisting their meaning, give to a statute a construction other than was intended by the lawmakers."

In Bowman v. Pace, supra [119 F.2d 860], the Court said: "If one has not hired another expressly, nor suffered or permitted him to work under circumstances where an obligation to pay him will be implied, they are not 'employer and employee' under the Act."

"The statutory definitions of 'employer,' 'employee' and 'employ' are in very general terms, and should be understood in 'their natural sense, and intended to describe the conventional relations of employer and employee.' * * * The Act thus contemplates (a) a situation in which the employer, expressly or impliedly, agrees to pay a certain sum of money to the employe, and (b), has the control and determination of the hours of work by the employe. * * *" Schroepfer v. A. S. Abell Co., D.C., 48 F.Supp. 88, 94.

In Helena Glendale Ferry Co. v. Walling, 8 Cir., 132 F.2d 616, 620, we find the following statement: "The Act defines an employee as 'any individual employed by an employer,' and the word 'employ' as used in the Act includes 'to suffer or permit to work.'"

"In providing by the Fair Labor Standards Act that the term 'employ' includes 'to suffer or permit to work,' Congress did not intend to destroy established rules fixing the status and affecting the relationship of employer and employee in actions based upon that relationship, and the quoted phrase was used to protect employees who actually were employees within the usually accepted meaning of the terms, regardless of terminology used in contract of employment." Walling v. Todd, D.C., 52 F.Supp. 62, 65.

In defining the term "employ" in this section as "to suffer or permit to work," it was the intent of Congress to hold every manufacturer engaged in interstate commerce responsible for connivance or collusion with anyone who assumed the status of independent contractor when in fact such individual was merely agent or servant or employee of the manufacturer, and to protect the employee against anyone whose real status in bringing about a contractual relationship in employment is not bona fide. See: Maddox v. Jones, supra.

It is my ruling that the evidence does not warrant a finding that collusion existed or good faith was lacking between the defendant and the Commission.

While it is true that the defendant regularly "suffered" or "permitted" the plaintiffs to perform necessary protective services in and upon its premises, in the absence of the contractual relationship of employer and employee such is not within the sense or meaning of the term "suffer or permit" as used in the Fair Labor Standards Act of 1938. It is therefore my conclusion that the plaintiffs' action fails and may not be maintained as provided by the terms of Section 216(b) of the Act.

Accordingly the defendant's motion for judgment is granted, and an order in conformity therewith will be entered.