**WALLING v. McKAY et al.**

Civ. No. 155.

District Court. D. Nebraska,
North Platte Division.

Dec. 16, 1946.

Reid Williams, Regional Atty., Dept. of Labor, and John A. Weiss, Dept. of Labor, both of Kansas City, Mo., for plaintiff.

C. B. Matthai and George Holdrege of the Union Pac. R. Co. Legal Staff, both of Omaha, Neb., for defendants.

DONOHOE, District Judge.

This is an action brought by L. Metcalfe Walling, Administrator of the Wage and Hour Division, United States Department of Labor, against Arthur E. McKay and Elmer O. McKay, doing business as McKay Brothers.

The parties have stipulated (plaintiff's Exhibit 1) as follows:

I. That this action is brought by the Administrator to enjoin the defendants from what the Administrator alleges to be violations of the provisions of Sections 15(a) (1), 15(a) (2) and 15(a) (5) of the Fair Labor Standards Act of 1938, Act of June 25, 1938, c. 676, 52 Stat.L. 1060, Title 29 U.S.C.A. § 201 et seq., but which allegations are denied by the defendants.

II. That this court is vested with jurisdiction to determine the issues herein by section 17 of the Act.

III. That since on and after April 1, 1942,

(a) the defendants, during the intervening period of time and including the present, have employed approximately 57 persons, normally in crews consisting of from 5 to 10 workers, and occasionally as

many as 15 workers, in and about their place of business at Sidney, Nebraska, to unload lumber from railroad cars, to mark and cut such lumber into specified lengths, and to produce, manufacture, fashion and assemble the lumber into grain doors and coal doors of various sizes for use by the Union Pacific Railroad Company on its freight cars;

(b) that all of said grain doors and coal doors so produced were delivered by the defendants to the Union Pacific Railroad Company for use by it in its railroad business;

(c) that such freight cars, so equipped, were and are used indiscriminately in interstate commerce, and in intrastate commerce within the State of Nebraska and within other states; and

(d) that the persons employed by the defendants to perform such service were and are engaged in the production of goods for commerce within the meaning of the Act.

IV. That many of the persons so employed by the defendants to perform the services set forth in Section III have since October 24, 1940, performed and are performing said services at the defendants' place of business at Sidney, Nebraska, and have on numerous occasions been permitted by the defendants to work for work weeks longer than 40 hours, for which these employees have not been compensated for their work and services in excess of 40 hours in such work weeks during said period at rates of pay not less than one and one-half times their regular rates of pay.

V. That on October 21, 1938, the Administrator of the Wage and Hour Division, United States Department of Labor, pursuant to the authority conferred upon him by Section 11(c) of the Act, duly issued and promulgated regulations prescribing the records of persons employed and of the wages, hours, and other conditions and practices of employment which shall be made, kept and preserved by every employer subject to any provision of the Act; that on August 13, 1941, the Administrator, pursuant to said authority, duly issued regulations prescribing the records which shall be made and kept by employers subject to any of the provisions of the Fair Labor Standards Act of 1938, repealing and superseding all such regulations previously issued, and the said regulations and amendments thereto were published in the Federal Register, September 13, 1941, (6 F.R. 4694); are known as Title 29, Chapter V, Code of Federal Regulations, Part 516; and became effective September 15, 1941.

VI. That with respect to all individuals so employed by the defendants, as set out in Section IV (III) of the stipulation, the defendants have not maintained or kept records which comply with Section 516.2 of the Regulations, in that their addresses are not shown in the file, the occupations of employees are not shown, work weeks are not indicated, nor the hourly rate of pay, or the total hours of work on piece-rates for each day in each week of the period during which they were employed.

The case having been submitted to the court for its decision upon the pleadings, stipulation of facts and oral and documentary evidence, the court now makes the following additional special

### Findings of Fact.

1. The defendants Elmer O. McKay and Arthur E. McKay are now, and have been since 1942, engaged in manufacturing, storing and repairing grain doors and coal doors for the Union Pacific Railroad Company at Sidney, Nebraska, under the name of "McKay Brothers". Before 1942, the defendants were engaged in the same activity at Cheyenne, Wyoming.

2. The defendants jointly own a ranch of 3,500 acres in Colorado, and the defendant Arthur E. McKay has an interest in an estate consisting of 640 acres of grazing land in Nebraska. These properties are operated by tenants.

3. On May 4, 1939, the defendants entered into a written contract, a copy of which was duly offered and received in evidence as plaintiff's Exhibit 2, with the Union Pacific Railroad Company for the manufacture, repair and storage of grain doors and coal doors and the handling, sawing and piling of lumber required in

making and repairing grain and coal doors for the Railroad Company at Cheyenne, Wyoming.

4. On February 21, 1940, the defendants and the Union Pacific Railroad Company entered into a written agreement, a copy of which was duly offered and received in evidence as plaintiff's Exhibit 3, whereby the contract dated May 4, 1939, was extended to March 31, 1941, and on February 17, 1941, the parties entered into a similar agreement extending the contract to March 31, 1942. On January 1, 1942, the parties entered into an "Addendum To Agreement dated May 4, 1939," amending Section 11 of the contract dated May 4, 1939, by increasing the amount of compensation to be paid by the Railroad Company to the defendants for performing work specified under the contract.

5. On April 24, 1942, the defendants and the Union Pacific Railroad Company entered into a written contract, a copy of which was duly offered and received in evidence as plaintiff's Exhibit 4, whereby the operations in connection with the manufacture, repair and storage of grain doors and coal doors were transferred from Cheyenne, Wyoming, to Sidney, Nebraska.

6. During the years of 1944, 1945 and 1946, the Union Pacific Railroad Company followed the procedure of placing "Standing Orders", copies of which were duly offered and received in evidence as plaintiff's Exhibits 6, 7, 8, 9, 11 and 12, with the defendants covering the manufacture, repair and storage of grain and coal doors and the handling and sawing of lumber at Sidney. These "Standing Orders" merely specify the rates of compensation to be paid by the Railroad Company to the defendants for performing specified work and contain no agreement by the Railroad Company to take any specified quantity of doors.

7. The operations carried on at Sidney are devoted exclusively to the manufacture, repair and storage of grain and coal doors for the Union Pacific Railroad Company, and are conducted on property owned by the Company and not leased to the defendants or to any one else. Trackage installed by the Railroad Company, lighting equipment, water for fire protection, a small building used by the defendants as an office, a lunch and locker room, and a place to store tools are located on the property.

8. All of the tools and equipment used in the manufacture and repair of the doors, except hatchets used by the workmen and a tractor purchased by Arthur McKay at a cost of $500, for use in moving railroad cars in the yard at Sidney, are furnished and owned by the Union Pacific Railroad Company. Gasoline for the tractor is purchased from third parties and paid for by the defendants, but electricity for lighting purposes and for operating two power saws in the yard is supplied by the Company.

9. The defendants do not go out into the open market to buy or otherwise secure necessary materials but work with materials furnished and owned by the Railroad Company, and the amount of work performed by the defendants and the other workmen is directly dependent upon the amount of materials furnished by the Company.

10. The operations at Sidney have been, since May 16, 1941, under the direct supervision of the Union Pacific Railroad Company's Assistant General Storekeeper, who usually inspects the yard at Sidney once every 60 days, and gives instructions to either Elmer or Arthur McKay concerning safe working conditions and the minimizing of fire hazards. The Assistant General Storekeeper checks the books pertaining to grain door operations, these books being signed by the storekeeper and one of the McKay Brothers. The Company's storekeeper at Sidney is under the direct supervision of the Assistant General Storekeeper.

11. The defendants are not free to exercise their own discretion in determining the manner or order in which cars are loaded or unloaded in the yard at Sidney. Neither are the defendants free to decide whether lumber which has been unloaded and sawed and piled in the yard will be made up into doors or loaded out to other points on the Union Pacific Railroad. Nor may the defendants decide whether the

workmen shall refrain from making one type of door and work exclusively on another type. All of these matters are controlled by the Railroad Company, through its storekeeper and Assistant General Storekeeper.

12. Grain doors and coal doors manufactured or repaired by the defendants are made according to specifications (blueprints) furnished by the Union Pacific Railroad Company, and the making and repairing of doors requires no special skill or training but is just "hammer and nail work".

13. When finished doors, which have been piled in piles in the yard at Sidney, are needed by the Union Pacific Railroad Company, the necessary empty cars are ordered into the yard by the storekeeper, who then gives instructions to the defendants as to the amount of doors to be loaded into the cars and the manner or fashion of loading. Workmen who may then be engaged in making doors are, upon directions from the storekeeper, moved by the defendants and told to load doors.

14. The Union Pacific Railroad Company's storekeeper at Sidney makes a daily check in the yard to determine how many doors, either grain or coal, were made on the previous day and to observe whether the operations are being carried on in a safe manner. The storekeeper then prepares a "Store Order Notification and Receipt" acknowledging a given number of doors. The procedure in the use of the "Store Order Notification and Receipt" is the same as that which is followed in Union Pacific shops elsewhere.

15. Because of scarcity of lumber, the Union Pacific Railroad Company has in the last two or three years purchased made-up grain doors to the extent of 250 to 300 thousand per year from outside manufacturers to whom the Railroad furnishes specifications but no lumber or tools. The Railroad Company, in purchasing and ordering doors from outside manufacturers, has followed the same procedure with reference to the use of "Standing Orders" as has been followed in dealing with the defendants, except that orders on the outside manufacturers call for the manufacture of a given quantity of doors. Between 65 and 70 per cent of the doors which were stored at Sidney as of the time of the trial of this case had been made by outside manufacturers.

16. When doors purchased by the Union Pacific Railroad Company from other manufacturers are shipped to Sidney for storage, and such doors have not been previously inspected at the mill, the defendants, upon orders from the Company, inspect the doors for quality and number when they are unloaded, and make a report of the inspection to the Company. These inspections are sometimes made jointly by the storekeeper and Arthur E. McKay. The compensation received by the defendants for unloading these doors is fixed by the terms of the contract between the defendants and the Company, and the defendants do not receive any extra compensation for their work in inspecting these doors.

17. The defendant, Arthur E. McKay, was hired by the Union Pacific Railroad Company as an employee in 1912, and commenced grain doors with his brother, Elmer O. McKay, in 1915. Since that time, except during the years of 1917, 1918 and 1919, when the defendants were engaged in contracting for road work under the name of "McKay Brothers, Contractors", Arthur E. McKay has been engaged in making grain and coal doors for the Railroad Company.

18. The designation "McKay Brothers, Contractors" was adopted by the defendants when they were engaged in contracting for road work, and the defendants still use billheads and checks bearing this designation, but which were printed while the defendants were engaged in road work.

19. The defendants have no place of business at Sidney other than that on the property of the Union Pacific Railroad Company where the doors are manufactured, and have never constructed grain and coal doors for any person other than the Union Pacific. The defendants do not advertise for work as contractors and have no sign or other identification at the place where the doors are made designating themselves as contractors, and do not hold

themselves out to the public as being contractors.

20. The Union Pacific Railroad Company does not require the defendants to be at the grain door yard at Sidney for any fixed amount of time, but expects one of them to be there practically all of the time, and one of the defendants tries to be at the yard all of the time.

21. The rates of pay received by the defendants from the Union Pacific Railroad Company for the defendants' work in manufacturing, storing and repairing grain and coal doors and handling, sawing and piling lumber at Sidney are fixed by the terms of the contracts between the Railroad Company and the defendants. The "Store Order Notification and Receipt" is used by the Railroad Company as the basis for paying the defendants for the manufacture of grain or coal doors, and reports prepared by the Railroad Company's inspector-in-the-field as to the amount of lumber which has been loaded into cars serve as the bases for paying the defendants for unloading and sawing lumber at Sidney.

22. At the end of each month, the defendants present to the Union Pacific Railroad Company a bill covering work performed during that month, and this bill is usually paid by the Company within 20 days. The money representing monthly payments received by the defendants from the Railroad Company is deposited by the defendants in a joint bank account under the name of "McKay Brothers, Arthur E. and Elmer O." and either of the defendants write checks on that account.

23. Workmen employed to work in the grain door yard at Sidney are interviewed and hired by either Arthur or Elmer McKay, who determine the hours to be worked and the rates of pay to be received by these workmen. The workmen are paid on an hourly basis for labor in loading and unloading material and sawing lumber and on a piece-work basis for the making of grain and coal doors. All of the workmen perform both types of work. The McKays do not keep an account of the hours worked or the hourly rate of pay of the workmen while they are engaged in piece-rate work, and the workmen are not required to adhere to a fixed schedule of hours when performing this type of work but are permitted to "come when they please and go home when they please". The workmen are not paid overtime in excess of eight hours per day unless they are engaged in work for which payment is made on an hourly basis.

24. The wages paid to the workmen are computed by either Arthur or Elmer McKay, and since 1939 the workmen have been paid "every week or oftener if they need it" by checks drawn on the joint bank account of McKay Brothers and signed with the personal signature of Arthur or Elmer McKay.

25. Neither Arthur McKay nor the workmen have any seniority rights on the Union Pacific Railroad Company's seniority roster, and the workmen are not represented by any labor union or railroad brotherhood. Passes for travel privileges on a specific trip which was not connected with business for the Company have been furnished to Arthur McKay by the Railroad Company.

26. Although the rates at which the defendants are compensated by the Union Pacific Railroad Company for performing specified operations or work in the yard at Sidney have been fixed by the terms of contracts between the defendants and the Railroad Company, the rates of such compensation have been increased from time to time by the Company upon the defendants' request.

27. After the Commissioner of Internal Revenue ruled that the defendants and the men working with them were subject to the Carriers' Taxing Act of 1937, 45 U.S.C.A. § 261 et seq., Arthur E. McKay applied for, and received from the Commissioner of Internal Revenue, a refund of taxes which had been paid under the Social Security Act, 42 U.S.C.A. § 301 et seq., and the money thus refunded was turned over to the Union Pacific Railroad Company by Arthur E. McKay.

28. The court further finds all of the facts which have been stipulated.

It was stipulated at the trial, subject to the plaintiff's objection of incompetency and immateriality, that money received by

the Union Pacific Railroad Company from the defendants was paid to the Collector of Internal Revenue under the Carriers' Taxing Act of 1937 after the ruling by the Deputy Commissioner of Internal Revenue (Defendants' Exhibit 15) that the defendants and the individuals engaged by them were employees of the Railroad Company for purposes of taxes imposed under the Act. It was also stipulated, subject to the same objection by the plaintiff, that by virtue of the ruling of the Deputy Commissioner of Internal Revenue, as disclosed in Defendants' Exhibit 16, that either of the defendants, in paying the men employed by them, withheld under the Withholding Tax Act, 26 U.S.C.A. Int.Rev.Code, § 1621 et seq., certain sums for the payment of income taxes, thereafter sending a statement to the Union Pacific Railroad Company showing the amounts withheld, and that the Railroad Company, in remitting to the defendants, withheld the amounts due under the Withholding Tax Act, and reported to the Bureau of Internal Revenue the amounts withheld for each individual employee and paid these amounts to the Collector of Internal Revenue. The defendants stipulated that workmen engaged in working in the grain door yard did not receive the benefit of any increase in wages under an award made in a recent labor case before the Railroad Mediation Board.

## Opinion

The question for determination is whether, in the factual setting of this case, the defendants are employers within the meaning of Section 3(d) of the Fair Labor Standards Act of 1938, Act of June 25, 1938, C. 676, 52 Stat. 1060, Title 29 U.S.C.A. § 203(d).

Section 3 of the Act provides:

"As used in this Act—

\*    \*    \*    \*    \*    \*

"(d) 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee but shall not include the United States or any State or political subdivision of a State, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.

"(e) 'Employee' includes any individual employed by an employer.

\*    \*    \*    \*    \*    \*

"(g) 'Employ' includes to suffer or permit to work."

The plaintiff's position, stated briefly, is that during the period of time involved in this action (October 24, 1940, to the present) the defendants have had the status of an independent contractor with respect to the Union Pacific Railroad Company (herein sometimes referred to as the Railroad Company or the Company) and that for the purposes of the Fair Labor Standards Act the defendants are employers of the workmen engaged in performing services in the grain door yard at Sidney, Nebraska.

The defendants contend that each of the persons employed by them was at all times an employee of the Union Pacific Railroad Company and that the defendants, in engaging the services of such persons, acted as agents for the Railroad Company. Special reliance is placed upon rulings by the Commissioner of Internal Revenue holding that the defendants and the individuals engaged by them were employees of the Railroad Company for purposes of the Carriers' Taxing Act of 1937 and the Withholding Tax Act. It is alleged in the answer that the Commissioner, after his ruling with respect to the former Act, refunded to the defendants all taxes which had theretofore been paid by them pursuant to the provisions of the Federal Tax Contribution Act, Section 1400, Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 1400, within the preceding four years upon the compensation of the individuals engaged by the defendants, upon the ground that such individuals were employees of the Union Pacific Railroad Company.

In the concluding paragraphs of the answer it is alleged that the Union Pacific Railroad Company is subject to the provisions of Part I of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., and that Section 7 of the Fair Labor Standards Act has no application to employees of the Railroad Company because such employees are expressly exempted therefrom by Section

13(b) (2) of the latter Act which provides that "The provisions of section 7 shall not apply with respect to * * * (2) any employee of an employer subject to the provisions of Part I [of the Interstate Commerce Act]."

The evidence establishes that the relationship between the defendants and the Railroad Company, during the time involved in this action, had its inception in a written contract which was entered into on May 4, 1939; that this contract was extended, with changes as to the amounts to be paid to the defendants, from year to year until April 24, 1942; that on the latter date a new contract, in substantially the same form, was entered into transferring the work from Cheyenne, Wyoming, to Sidney, Nebraska; that the work was performed pursuant to this contract until 1944; and that commencing in January, 1944, and continuing until the time of the trial of this case the work was handled under so-called "Standing Orders".

The contract of May 4, 1939, (plaintiff's Exhibit 2) after certain preliminary recitals wherein Arthur E. McKay and Elmer O. McKay are designated as "Contractors", sets forth the mutual agreements and undertakings of the parties in succeeding sections.

Section I provides:

"The Contractors shall furnish (except as herein otherwise specifically provided) all superintendence, labor, tools, plant and equipment and shall in an expeditious, substantial and workmanlike manner to the satisfaction and acceptance of the Railroad Company,

"(a) manufacture, repair and/or store all temporary grain doors and temporary coal doors which the Railroad Company may desire to have manufactured, repaired and/or stored at Cheyenne, Laramie County, Wyoming; and

"(b) handle cars or piles to saw, saw to proper lengths and widths and pile after sawing, all lumber required by the Contractors in connection with the manufacture and repair of temporary grain doors and temporary coal doors for the Railroad Company at Cheyenne, Wyoming."

Section 2 provides that the Company will furnish and deliver to the Contractors:

"All temporary grain doors which the Railroad Company desires to have stored by the Contractors and, in random lengths, all lumber necessary for the manufacture and/or repair of such temporary grain doors and temporary coal doors, as the Railroad Company may desire to have manufactured and/or repaired at Cheyenne. The Railroad Company will also furnish all nails, lamp black, oil and workmen's benches necessary for the manufacture and/or repair of said temporary grain doors and/or temporary coal doors.

"The Railroad Company will, at its own expense, furnish a power saw and such power as may be necessary to operate the same, it being expressly understood and agreed, however, that said saw shall be used for no purpose other than for sawing lumber for temporary grain doors and temporary coal doors as herein provided."

Under the provisions of Section 3 the Company agrees to perform all necessary switching of loaded and empty cars free of any expense to the Contractors.

Section 4 provides that the Contractors shall manufacture and repair all grain and coal doors in strict accordance with the specifications shown on designated drawings of the Company.

Section 5 requires the Contractors to make good, at their own expense, all defects in doors manufactured or repaired by them resulting from poor workmanship.

Section 6 provides:

"The Contractors shall manufacture and/or repair temporary grain and coal doors in such quantities and at such times as may be required by the Railroad Company and shall pile the same in the manner hereinafter provided and/or shall load in cars furnished by the Railroad Company such quantities thereof as the Railroad Company from time to time may specify.

"The Contractors shall increase or decrease their forces at any time, as the occasion may demand, when such increase or decrease in said force of the Contractors is desired by the Railroad Company."

Section 7, after providing that the Contractors shall unload, saw and pile all lum-

ber and other materials required in connection with the manufacture and repair of grain and coal doors, and shall unload and pile all doors delivered to them for repair or storage, specifies the exact manner in which the lumber and doors shall be piled and provides that the Contractors shall keep all fire roadways free from obstructions at all times and maintain the premises where the work is performed in a neat and tidy condition.

Under Section 8 the Contractors are obligated to load and unload all cars promptly and to bear the amount of any demurrage accruing on the cars.

By the provisions of Section 9, the Contractors agree to furnish all tools and appliances, not specifically mentioned to be furnished by the Company, which may be necessary to carry on the work and to keep all tools and appliances, including those furnished by the Company, in good and safe condition.

Section 10 prohibits the Contractors from employing persons not mentally and physically qualified to do the work with safety to themselves and others.

Section 11 sets forth the rates at which the Contractors are to be paid by the Company for performing specified work.

Under the terms of Section 12, the Company agrees to pay the bills rendered by the Contractors within 20 days after the date thereof:

"Provided, however, that such bills shall be subject to check by representatives of the Railroad Company with respect to the work done and the amount of lumber unloaded, sawed and piled, the number and kind of said temporary grain and coal doors manufactured and/or stored or loaded by the Contractors as indicated by such inspection."

Section 13 provides that: "The work shall be performed under the personal supervision of the Contractors * * *" and prohibits the assignment of the contract or any interest therein without the written consent of the Company.

It is provided in Section 14 that: "The Contractors are masters in respect to all the work done by them as herein provided and the Contractors' servants and employes

are not the servants and employes of the Railroad Company in any particular whatsoever."

It is provided in Section 15: "The Contractors shall pay the wages and salaries of the servants and employes of the Contractors in strict accordance with federal enactments and with the laws of the State of Wyoming, and shall indemnify and hold harmless the Railroad Company from and against all damages, penalties and expenses of whatsoever nature resulting from failure so to do."

Section 16 provides: "The Contractors shall comply with and operate under all applicable federal enactments and those of the State of Wyoming, regarding Employers Liability, Workmen's Compensation and Workmen's Insurance and expressly covenant and agree that the Contractors' employes engaged on the work herein undertaken to be done by the Contractors are not and shall not be treated or considered as the servants and employes of the Railroad Company * * *"

Under other provisions of this section, the Contractors agree to save and hold harmless the Company from the payment of damages or claims arising from injuries to or death of the Contractors, or either of them, or their employes, where such injuries or death occur because of, or in connection with, the carrying on of the work to be performed by the Contractors.

By the provisions of Section 17, the Contractors agree to accept exclusive liability for the payment of all pay roll taxes or contributions for unemployment insurance or old age pensions or annuities which are measured by the wages or other remunerations paid to employees of the Contractors and to reimburse the Company for any of such taxes and contributions as by law the Company may be required to pay.

According to the language of Section 18: "This agreement may be terminated, by written notice given by either party hereto to the other party, on any date in such notice stated, not less, however, than thirty days subsequent to the date on which such notice shall be given."

Section 19 of the Contract states: "This agreement shall take effect as of the 1st

day of April, 1939, and, unless sooner terminated as herein provided, shall continue in full force and effect for a period of one (1) year."

Except for changes increasing the amount of compensation to be paid by the Company to the defendants, the contract of April 24, 1942, (plaintiff's Exhibit 4) is in substantially the same language.

The plaintiff in his brief, while pointing to certain language appearing on the reverse side of the "Standing Orders" as indicative of a buyer-seller relationship, acknowledges that no substantial changes in the details of the defendants' operations were made during the years 1944, 1945 and 1946, and that during these years the defendants have carried on their work in the same manner as while operating under the previous, but more formal, contracts. It is also said in the plaintiff's brief that the contracts between the defendants and the Railroad Company do not amount to a collusive scheme whereby the defendants, to evade the Fair Labor Standards Act, hired employees for the benefit of the Company.

Counsel for both sides have directed the court's attention to many cases wherein the Fair Labor Standards Act has been under consideration. A study of these cases discloses that all of them are factually distinguishable from the present action, but certain principles which have been established in these cases should be recognized.

■■■ The Fair Labor Standards Act "was designed to raise substandard wages and to give additional compensation for overtime work as to those employees within its ambit, thereby helping to protect this nation 'from the evils and dangers resulting from wages too low to buy the bare necessities of life and from long hours of work injurious to health'". United States v. Rosenwasser, 323 U.S. 360, 361, 65 S.Ct. 295, 296, 89 L.Ed. 301. And "Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people". Phillips, Inc., v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095, 157 A.L.R. 876.

■■■ The Act must not be interpreted or applied in a narrow, grudging manner, and any custom or contract falling short of the basic policy of Congress to achieve a uniform national policy of guaranteeing compensation for all work engaged in by employees covered by the Act cannot be utilized to deprive employees of their statutory rights. Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949, 152 A.L.R. 1014. Furthermore, the obligations imposed by the Fair Labor Standards Act and the provisions embodied therein must be read into and treated as being a part of every contract of employment to which the Act applies. Northwestern Yeast Co. v. Broutin, 6 Cir., 133 F.2d 628.

■■■ Congress intended to include within the protection of the Act every employee engaged in commerce or in production for commerce within the broad scope of those activities expressed in the law, Helena Glendale Ferry Co. v. Walling, 8 Cir., 132 F.2d 616, and the Act must be given a liberal construction in accordance with its obvious intent and purpose. Musteen v. Johnson, 8 Cir., 133 F.2d 106. A court should assume that all employees engaged in interstate commerce, so far as reasonably possible, should be made subject to the provisions of the Act. Those asserting, in reference to an employee, an exemption under the Act must establish that exemption as being both within the spirit and the letter of the statute. Sections of the Act granting exemptions are to be construed strictly against those claiming them. Helena Glendale Ferry Co. v. Walling, supra; Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52; Miller Hatcheries, Inc., v. Boyer, 8 Cir., 131 F.2d 283; Smith v. Porter, 8 Cir., 143 F.2d 292; Fletcher v. Grinnell Bros., 6 Cir., 150 F.2d 337; and one claiming an exemption must establish his right by a clear preponderance of the testimony. Smith v. Porter, supra; Walling v. Newman, D. C. Iowa, 61 F.Supp. 971.

The Fair Labor Standards Act is a law complete in itself and, since Congress has defined the meaning of certain terms as used in the Act, these statutory definitions are controlling. Fox v. Standard Oil Co., 294 U.S. 87, 55 S.Ct. 333, 79 L.Ed. 780; Western Union Telegraph Co. v. Lenroot 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414; Bernhard v. Metcalfe Const. Co., D.C.Neb., 64 F.Supp. 953. And there being no ambiguity or doubtful significance in the meaning of these terms, the court may not, for purposes of interpretation and construction, resort to other statutes, especially statutes on different subjects and having purposes different from those of the Fair Labor Standards Act. See United States v. Colorado & N. W. R. Co., 8 Cir., 157 F. 321, 15 L.R.A.,N.S., 167, 13 Ann.Cas. 893; District of Columbia v. Gladding, 49 App.D.C. 232, 263 F. 628; Walling v. Consumers Co., 7 Cir., 149 F.2d 626; Walling v. Northwestern-Hanna Fuel Co., D.C. Minn., 67 F.Supp. 833.

The meaning of the terms "employer", "employee" and "employ", as used in the Act, has been considered by the courts in other cases.

In United States v. Rosenwasser, 323 U. S. 360, 362, 65 S.Ct. 295, 296, 89 L.Ed. 301, the Supreme Court said that, "A broader or more comprehensive coverage of employees within the stated categories would be difficult to frame". Senator (now Mr. Justice) Black, speaking on the floor of the Senate, said that the term "employee" as used in the Act has been given "the broadest definition that has ever been included in any one act". 81 Cong.Rec. 7657.

As used in Section 3(g) of the act providing that " 'Employ' includes to suffer or permit to work", the words "to suffer or permit to work" do not mean that every one who permits some one to work for a third person or the worker's own self becomes an employer bound to pay statutory wages. They mean that one is an employer if he permits another to work for him, though he has not expressly hired or employed him. Walling v. Jacksonville Terminal Co., 5 Cir., 148 F.2d 768. That certiorari has been granted in Walling v. Nashville, Chattanooga & St. Louis Ry., 6 Cir., 155 F.2d 1016 and in Walling v. Portland Terminal Co., 1 Cir., 155 F.2d 215 and that these cases present questions similar to those involved in the Jacksonville Terminal Co. case has not been overlooked by the court. See 67 S.Ct. 85.

The parties to this action differ over the method to be pursued in approaching the question for determination. The plaintiff urges that the traditional common-law tests of an employer-employee relationship are not alone controlling in determining coverage or non-coverage under the Act and that the Act covers many persons who would not be deemed employees at common law. However, the defendants place special emphasis upon the common-law rules.

In many cases, most of which have been decided since the decision in National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, the courts have held that the traditional common-law tests or concepts of an employer-employee relationship for purposes of determining tort liability do not apply, or at least are not controlling, in dealing with social legislation, and that under such legislation the area between employment and entrepreneurial enterprise is to be surveyed and determined in practical industrial and economic perspective and with regard for the special remedial purpose of the legislation. Walling v. Wabash Radio Corporation, D.C.Mich., 65 F.Supp. 969 (Fair Labor Standards Act); Grace v. Magruder, Collector etc., App.D.C., 148 F.2d 679 (Social Security Act); Walling v. American Needlecrafts, Inc., 6 Cir., 139 F.2d 60 (Fair Labor Standards Act); Walling v. Woodbine Coal Co., D.C.Ky., 64 F.Supp. 82 (Fair Labor Standards Act); United States v. Vogue, Inc., 4 Cir., 145 F.2d 609 (Social Security Act); Walling v. Merchants Police Service, Inc., D.C.Ky., 59 F.Supp. 873 (Fair Labor Standards Act); Walling v. Rutherford Food Corporation, 10 Cir., 156 F.2d 513, certiorari granted 67 S.Ct. 192 (Fair Labor Standards Act). See also Birmingham, etc., v. Bartels, 8 Cir., 157 F.2d 295 (Social Security Act).

There is some authority in support of the view that previously existing standards for determining an employer-employee re-

lationship still prevail under the Fair Labor Standards Act. In the comparatively recent case of Dugas v. Nashua Manufacturing Co., D.C.N.H., 62 F.Supp. 846, at page 849, Judge Connor said: "The purposes and aims of the Act are social and remedial. It was not its purpose to create new wage liabilities, but where such existed, to measure them by the standards fixed by law. The usual and accepted concept of employer and employee relationship which has heretofore been recognized as fundamental in defining the elements necessary to its creation, still prevails, unimpaired and unchanged. This legislation was not intended to abrogate these principles, either in letter or in spirit, and while the rights of the employee were to be carefully guarded, the substantive law remained untouched".

And in Maddox v. Jones, D.C.Ala., 42 F.Supp. 35, at page 41, the court said: "This court is of the opinion that the definitions in the Act were not intended by Congress, however moved it was by humanitarian impulses, to destroy the well founded and long established rules fixing the status and affecting the relationship of employer and employee in actions based upon that relationship. It is not the province of courts to give to words used in the statute a strained or unreasonable meaning. It is difficult to believe that Congress intended to make the employee an employer or to change the relationship existing between one who has obligated himself to pay, and another obligated to labor for such pay".

A test which is helpful in determining whether one is the employee of one or the other of two alleged employers is found in Bertino v. Marion Steam Shovel Co., 8 Cir., 64 F.2d 409. After quoting extensively from the Supreme Court's opinion in Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480, Circuit Judge Booth concluded with the following significant language taken from page 225 of the opinion in the Standard Oil Co. case in 212 U.S., page 255 of 29 S.Ct.: "In many of the cases the power of substitution or discharge, the payment of wages and other circumstances bearing upon the relation are dwelt upon. They, however, are not the ultimate facts, but only those more or less useful in determining *whose is the work and whose is the power of control*". (Italics added.)

That the facts in the Bertino and Standard Oil Co. cases are readily distinguishable from those in the instant action does not render inapplicable the reasoning in those cases, and under that reasoning or rule whether the workmen here involved are employees of the defendants or employees of the Railroad Company depends upon whose work these workmen are performing and who has the power of control over this work.

Keeping in mind the foregoing rules and the remedial purposes of the Fair Labor Standards Act, let us consider the evidence from the standpoint of the underlying industrial and economic realities and for the purpose of determining whose work is being performed, and who has the power of control over the performance of this work.

What has been said in the court's findings of fact need not be repeated at this point, but other aspects of the evidence are worthy of particular mention.

There is evidence indicating that many years before the time involved in this case, the Union Pacific Railroad Company had engaged in making doors as part of its business. In fact, Arthur McKay testified on cross-examination that he and his brother started making doors as employees in the Company's car department some time around 1914 or 1915. For some reason, which does not appear in the record, the Railroad Company has seen fit to have the grain door operations carried on at different places; at one time these operations were performed at Cheyenne, Wyoming, and thereafter they were moved and transferred to Sidney, Nebraska.

It is common knowledge that the loading and unloading of company materials from cars, and the transformation of such materials into manufactured articles for use by the railroad is a part of the regular business of a railroad. Likewise, it is well known by any one familiar with the railroad industry that grain and coal doors are a necessary and usual part of

the equipment of any railroad engaged in transporting grain and coal.

The formal contracts (plaintiff's Exhibits 2 and 4) do not call for the performance of only a specific or definite job. On the contrary, they are of a continuing nature purporting to cover work to be performed for an indefinite length of time, subject, however, to a right of cancellation or termination by either party upon 30 days' notice. And it is observed that under these contracts, as phrased, whether the defendants will perform any work is a matter resting entirely in the discretion of the Railroad Company. In other words, these contracts do not obligate the railroad to provide the defendants with any fixed amount of material or work, or to accept any designated number of doors.

Arthur McKay testified on cross-examination that he determined the hours and rates of pay of the workmen. But evidence in the form of plaintiff's Exhibits 3, 5, 6, 10 and 11, shows that the risk of economic fluctuations in wages of the workmen is borne by the Railroad Company. Furthermore, it is not easy to overlook the testimony of Arthur McKay showing that after the Commissioner of Internal Revenue ruled that the defendants and other workmen were subject to the Carrier's Taxing Act, this witness applied for and received a refund of taxes, which had been paid under the Social Security Act, and then turned over to the Railroad Company the money thus refunded.

The plaintiff points to evidence showing that the defendants own some interest in farm and ranch property and, upon the basis of this evidence, the plaintiff argues that the defendants are engaged in an independent occupation and are not employees of the Railroad Company. This argument has no persuasive value. Testimony, which is undisputed in the record, shows that the farm and ranch are operated by tenants, and that the defendants, aside from keeping some record of these operations, do not more than supervise the farming. While Arthur McKay admitted on cross-examination that looking after the farms takes considerable time, there is no other evidence that the defendants spend any appreciable amount of their time in supervising the farm and ranch.

■ The evidence, considered in its composite effect, constrains the conclusion that the operations conducted in the yard at Sidney form an integral part of the business of the Union Pacific Railroad Company, and that the defendants, as well as other workers in the yard, are employees of that Company. See Walling v. Rutherford Food Corporation, supra. The Railroad Company, not the defendants, is engaged in the business of making, repairing and storing grain and coal doors. Cf. Interstate Transit Lines v. United States, D.C.Neb., 56 F.Supp. 332; and the power of control over the performance of this work rests in the Company. In connection with this conclusion, it is noted that the defendants do not engage in making doors for others, or hold themselves out to the public as contractors. The absence of the exercise of an independent employment, business or occupation in which the defendants offer their services to the public points strongly to the conclusion that the contract is one of hiring and service. Grace v. Magruder, supra, and cases there cited.

We shall consider whether the relationship between the defendants and the Railroad Company is that of employer and employee when tested by the common-law rules for determining such relationship.

■ Counsel for both sides have made some reference in their briefs to local state decisions bearing upon the relationship created by contracts. While no particular issue over the matter has been raised, it seems proper to here make the observation that since the interpretation and application of a federal statute is involved local state decisions reflecting upon the relationship created by a contract, although instructive, are not conclusive upon a federal court in determining whether that relationship is of such nature that one of the parties to the contract is or is not subject to the terms of the statute. In other words, we are dealing with a field wherein the policy of the law is dominated by a federal statute and in that field federal, rather than local, law controls. National Labor Relations Board v. Hearst Publications, supra;

Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165; Prudence Realization Corporation v. Geist, 316 U.S. 89, 62 S.Ct. 978, 86 L.Ed. 1293; Lohman v. Commissioner of Internal Revenue, 8 Cir., 133 F.2d 977; Matcovitch v. Anglim, 9 Cir., 134 F.2d 834; American Oil Co. v. Fly, 5 Cir., 135 F.2d 491, 147 A.L.R. 824.

The common-law rules which are to be applied in determining whether one is an independent contractor or an employee are well settled, and an exhaustive enumeration and review of these rules will serve no useful purpose. However, a brief reference to some of the established principles is in order.

In Kreipke v. Commissioner of Internal Revenue, 8 Cir., 32 F.2d 594, at page 596, the Court, quoting with apparent approval from 14 R.C.L., page 67, said: "An independent contractor is one, who, exercising an independent employment, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer except as to the result of his work". The Restatement of the Law of Agency, Section 2, Sub-section (3) states that: "An independent contractor is a person who contracts with another to do something for him, but who is not controlled by the other nor subject to the other's right of control with respect to his physical conduct in the performance of the undertaking." And in Philadelphia, Baltimore & Washington R. Co. v. Karr, 38 App.D.C. 193, at page 196, the Court said: "The law of independent contractor is well settled. It exists only where the contractor engages to furnish all the materials, do all the work, and deliver a completed structure according to plans and specifications furnished by the principal, the will of the principal being represented only in the result of the work, and not in the means by which it is accomplished. Casement v. Brown, 148 U.S. 615, 13 S.Ct. 672, 37 L.Ed. 582."

The crux of the common-law distinction between an employer-employee relationship and an independent contractor status is in the right of the person for whom the services are performed to control and direct the person performing them not only with re-

spect to what shall be done but how it shall be done. Birmingham v. Bartels, supra; New Orleans, M. & C. R. Co. v. Hanning, 15 Wall. 649, 21 L.Ed. 220; Singer Manufacturing Co. v. Rahn, 132 U.S. 518, 10 S. Ct. 175, 33 L.Ed. 440. "The vital element which negatives such independence, in the relation between employer and employee, is the right to control the employee, not only as to the final result, but in the performance of the task itself. And, it is the right to control, not control or supervision itself, which is most important". Grace v. Magruder, App.D.C., 148 F.2d 679, 681.

A study of the formal contracts, material provisions of which have been heretofore quoted and summarized, leads to the conclusion that the relationship thereby created between the defendants and the Union Pacific Railroad Company was that of employer and employee. See Walling v. Woodbine Coal Co., supra; Walling v. Rutherford Food Corporation, supra. While there are some provisions in these instruments which, if isolated, are indicative of an independent contractor status, these contracts must be read and construed as a whole in determining the intention of the parties, Canadian Northern Railway Co. v. Northern Mississippi Railway Co., 8 Cir., 209 F. 758; Buchanan v. Swift, 7 Cir., 130 F.2d 483, and, when so construed, it is considered that the contracts vest in the Company a right to direct and control the defendants with respect to how their work shall be performed. "No one who ever earned his living in such a manner would have any doubt of its efficacy, or of the power of supervision and control implicit in the arrangement." Grace v. Magruder, App.D.C. 148 F.2d 679-682.

With reference to provisions in the contracts, the court reiterates and states again that whether the relationship between the parties is of such nature that one of them is an employer within the contemplation of the Fair Labor Standards Act must be determined from the language of the Act and the realities of the case, and not from language appearing in the contracts. Doll v. Commissioner, 8 Cir., 149 F.2d 239; Spillson v. Smith, 7 Cir., 147 F.2d 727; Matcovich v. Anglim, 9 Cir., 134 F.2d 834; Industrial Commission v.

Northwestern Mutual Life Ins. Co., 103 Colo. 550, 88 P.2d 560; Jack & Jill, Inc., v. Tone, 126 Conn. 114, 9 A.2d 497; Bertino v. Marion Steam Shovel Co., 8 Cir., 64 F.2d 409; Gulf Refining Co. v. Brown, 4 Cir., 93 F.2d 870, 116 A.L.R. 449; Sanford v. Goodridge, Iowa, 13 N.W.2d 40; Glielmi v. Netherland Dairy Co., 254 N.Y. 260, 171 N.E. 906; Nestle's Food Co. v. Industrial Commission, 205 Wis. 467, 237 N.W. 117; In re Morton 284 N.Y. 167, 30 N.E.2d 369; Griffiths v. Helvering, 308 U.S. 355, 60 S. Ct. 277, 84 L.Ed. 319; Moline Properties, Inc., v. Commissioner, 319 U.S. 436, 63 S. Ct. 1132, 87 L.Ed. 1499.

In the case of Birmingham v. Bartels, supra, [157 F.2d 306], Judge Gardner, after considering the law as announced in the foregoing cases, concisely and clearly stated the principle in the following language: "The contract terms designating or giving appellation to a relationship in form created by them, are not in any sense conclusive. Parties can not by the use of legal terms make impotent the legislative arm of the government. The actual facts, not the names or terminology employed, must govern."

The plaintiff does not seriously contend, nor does the court consider the contention would be meritorious, that there is clear and convincing proof that obligational provisions in the contracts giving the Railroad Company a right to control the defendants with respect to how the work shall be performed have been rescinded or abrogated by an express or implied agreement of the parties thereby changing their relationship. As previously noted, the plaintiff acknowledges that during the years of 1944, 1945 and 1946, the defendants have carried on their work in substantially the same manner as while operating under the previous, but more formal, contracts.

No good purpose will be served by attempting to follow in detail the plaintiff's arguments concerning numerous matters which are emphasized by the plaintiff in an effort to show that the relationship between the defendants and the Railroad Company is that of employer and independent contractor. However, brief comment will be made upon some of these matters.

The plaintiff attaches special significance to testimony showing that the defendants hire and fire workmen in the yard. But this argument overlooks and ignores provisions of the formal contracts specifying that the defendants shall increase or decrease their forces at any time, as the occasion may demand, when such increase or decrease in forces is desired by the Railroad Company. In other words, the defendants act merely as an instrumentality or agent of the Company in hiring and firing workmen. The same is true with respect to the manner in which the workmen are paid.

The plaintiff stresses the fact that the evidence shows that the workmen are not carried on the Union Pacific roster, have no seniority rights, are not covered by any bargaining agreements, do not receive the benefit of wage increases granted by the Railroad Mediation Board, and do not enjoy travel or other privileges customarily granted to railroad employees. This argument assumes, but without any foundation in the evidence, that a person may not be an employee of the Union Pacific Railroad unless such person meets the foregoing tests.

A sufficient answer to the plaintiff's argument referring to portions of the evidence wherein both the defendants and their counsel have referred to the workmen as employees of the defendants is found in Walling v. Western Weighing & Inspection Bureau, 7 Cir., 160 F.2d 47, wherein the court said: "True, the involved employees are in numerous instances referred to and designated as those of the defendant; in fact, they are so designated on books and records kept by the defendant. But because they are referred to as such does not alter the basic fact that they are employees of the railroads. We apprehend it is not an uncommon thing for employees of a large industrial or mercantile business to be referred to as those of some department or subdivision thereof and to be carried on the books as such. There at once comes to mind the situation in our own court. The personnel of the court and of the individual Judges are commonly referred to as employees of the court or of the Judge. In the clerk's

office the employees are referred to as those of the clerk and carried on the records in that office as such. This situation, however, would constitute no proof that they are not employees of the United States Government."

The cases of Walling v. Wabash Radio Corporation, D.C.Mich. 65 F.Supp. 969; Chicago, Rock Island & Pacific Railway Co. v. Bond, 240 U.S. 449, 36 S.Ct. 403, 60 L. Ed. 735; Greenberg v. Arsenal Building Corporation, 2 Cir., 144 F.2d 292, reversed in part, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296, upon which the plaintiff relies are distinguishable from this case. The first of the cited cases involved joint employers; a situation not present in the instant action. The question in the Bond case was whether, at the time of accident, the decedent was acting as an independent contractor or as an employee for his master. Time was not of the essence in the sense that employment for a fixed amount of time was necessary before the accrual of a cause of action. In the instant case, time is of the essence in that there must be employment for a certain length of time before a cause of action accrues. That cause of action, if any, is statutory, and the facts must bring the case within the statute. Furthermore, the opinion in the Bond case discloses that the decedent was engaged in performing the same or similar work for others. In the Greenberg case, a rental agent was held liable under the Fair Labor Standards Act as an employer of maintenance employees. But this agent was a corporation engaged in the business of managing a building for the owner.

The plaintiff has interposed objections to certain exhibits and testimony offered by the defendants on the ground that such evidence is incompetent and immaterial. These objections are overruled and the evidence is received. This evidence, while not binding, may be considered by the court as tending to show how the interested parties treated their contracts and the construction placed by these parties upon the relationship thereby created. Although this evidence does not establish the relationship, it reflects circumstances which may be considered with all the other circumstances in reaching a conclusion as to what is the relationship.

### Conclusions of Law

The defendants Arthur E. McKay and Elmer O. McKay and the other workmen employed in the grain door yard at Sidney, Nebraska, are employees of the Union Pacific Railroad Company. Since it is admitted by the plaintiff that the Union Pacific Railroad Company is a railroad carrier subject to the provisions of Part 1 of the Interstate Commerce Act, and the Fair Labor Standards Act expressly exempts employees of employers subject to the provisions of Part 1 of the Interstate Commerce Act, it necessarily follows that relief must be denied to the plaintiff and the action dismissed.

The clerk is hereby directed to enter a judgment dismissing this action.